CONTINENTAL TRADING, INC.,
Petitioner,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 15912.

United States Court of Appeals
Ninth Circuit.

March 10, 1959.

Rehearing Denied April 16, 1959.

Fred R. Tansill, Goodwin, Rosenbaum, Meacham & White, Washington, D. C., Leon, Weill & Mahony, New York City, for petitioner.

Charles K. Rice, Asst. Atty. Gen., Meyer Rothwacks, Joseph F. Goetten, A. F. Prescott, Attorneys, Department of Justice, Washington, D. C., for respondent.

Before POPE, DENMAN and ORR, Circuit Judges.

POPE, Circuit Judge.

Petitioner is a Panamanian corporation. It was organized in May, 1947, and maintained its principal office in Mexico City. For the year 1948 it filed an income tax return in California, and for the years 1949 and 1950 it filed such returns in Nevada.

The Commissioner determined deficiencies in the income tax of petitioner for each of those three years. The returns had been filed upon the assumption and with the claim that petitioner was a resident foreign corporation engaged in trade or business in the United States. The Commissioner determined, however, that it was a foreign corporation not engaged in trade or business within the United States and hence subject to a higher income tax liability.[1]

The taxpayer filed its petition in the Tax Court for redetermination of the deficiencies so asserted by the Commissioner. It presented to that court the sole question as to whether petitioner was a resident foreign corporation engaged in trade or business in the United States during those taxable years.

1. If petitioner qualified under § 231(b) it would be entitled to substantial dividends received credits.

The controlling statutory provisions are to be found in § 231 of the Internal Revenue Code of 1939, as amended by the Revenue Act of 1942, 56 Stat. 798.[2]

The facts relating to the question whether petitioner was or was not engaged in trade or business within the United States during the years in question are set out in the findings of the Tax Court. These described first what may be called the principal activities of the corporation during those years, and later, certain so-called casual or incidental transactions which the corporation carried on. The principal activities are described as follows:

"Petitioner qualified as a foreign corporation in Nevada in March, 1948, and continued to be so qualified until March, 1951. It used for its American address that of Reno, Nevada, company that acted as resident agent for petitioner and other foreign corporations. Petitioner represented that it maintained only one place of business in the United States.

"Grover Turnbow, a United States citizen with offices in Oakland, California, served as petitioner's president. After March, 1948, at the suggestion of the California attorney who served as petitioner's vice president, Turnbow had petitioner's name added to the business names already appearing on his Oakland office door and on the building directory, which were: International Dairy Association, Inc., International Dairy Engineering Co., and International Dairy Supply Company, hereafter referred to as Association, Engineering, and Supply, respectively. Turnbow was president and sole stockholder of Supply. Petitioner never used the Oakland address on its letterheads or otherwise and paid no rent for the Oakland office.

"Petitioner represented the incorporation of part of the vast holdings of Axel Wenner-Gren, an internationally famous financier whose wealth was over $1,000,000,000. Wenner-Gren held substantial amounts of stock in the Electrolux and Servel corporations, as well as sizable and diverse holdings in Mexican and other foreign enterprises. Prior to petitioner's incorporation, Turnbow served as attorney in fact in the United States for Wenner-Gren, who was then borrowing large sums from American lending institutions for use outside the United States.

"Turnbow became acquainted with Wenner-Gren in Mexico when he erected a recombined milk plant in which Wenner-Gren had a financial interest. Turnbow unsuccessfully sought to interest Wenner-Gren in financing the supplying of milk by Supply to the armed forces in the Far East.

"Turnbow and his various enterprises were interested in erecting recombined milk plants in foreign countries. Prior to and during the years here involved, the program failed to materialize because of the inability to reconvert foreign currency into American dollars, and the instability of foreign currencies.

"Turnbow hoped that petitioner would assist in the financing of these plants if his program for the establishment of recombined milk plants in foreign countries proved feasible. Its function would be to secure funds, but without any voice or activitity in the operations of the plants. Petitioner never undertook any activity in connection with the establishment of such recombined milk plants and never used its assets and borrowings for this or any related purpose.

"After petitioner's incorporation, it assumed Wenner-Gren's liabilities to various banks, having acquired his stock in the Electrolux and Servel corporations, which it thereupon pledged as security for loans. As of the beginning

---

2. § 231 in subdivision (a) relating to "non-resident corporations" provided for tax upon "every foreign corporation not engaged in trade or business within the United States", while subdivision (b) provided: "(b) Resident Corporations.— A foreign corporation engaged in trade or business within the United States shall be taxable as provided in section 14(c) (1) and section 15." 26 U.S.C.A. § 231 (a, b).

of 1948, petitioner had assumed indebtedness of Wenner-Gren as follows:

"Bank of America, N.T.&S.A., $1,100,000;

"Central Hanover Bank and Trust Company, New York, $480,000;

"Teleric, Inc., $926,000.

"Petitioner liquidated the loan from Central Hanover Bank during 1948. The loan from Teleric, Inc. remained outstanding as of the end of 1950. It liquidated the loan from the Bank of America in August 1948.

"From 1948 through 1950, petitioner had no paid employees in the United States. Turnbow received $1,500 per month during the last 6 months of 1950 denominated as salary for his services to petitioner. This represented part of an over-all settlement effectuated in June 1950 between Turnbow and Wenner-Gren, as individuals, whereby Turnbow would receive from Wenner-Gren stock and cash totaling $105,000. The settlement covered, among other items, Turnbow's services to Wenner-Gren from October 1946 through June 1950.

"Petitioner maintained no books of account in the United States. Its only records consisted of bank statements, check books, and documents pertaining to transactions within the United States, all in the care of Turnbow's secretary at Oakland. Petitioner maintained bank accounts in the United States at the First National Bank, Reno, Nevada, and at the Bank of America, N. T. & S. A. in San Francisco.

"Petitioner's only assets in the United States at the end of 1948 consisted of Electrolux and Servel stock and the two bank account balances.

"Petitioner reported on its tax returns for the years in question that it derived more than 50 per cent of its gross income from sources outside the United States. It reported gross income from sources within the United States, as follows:

| | |
|---|---|
| 1948 | $817,791.39 |
| 1949 | 605,635.10 |
| 1950 | 446,863.19 |

Of the 1948 gross income, $823,635.50 represented dividends on Electrolux and Servel stock. The difference was represented by a reported net loss of $5,844.11 resulting from sales of property other than capital assets. Of the 1949 gross income, $602,125.20 represented dividends, and $3,509.90 'Other Income in the United States.' Of the 1950 gross income, $441,624 represented dividends from the Electrolux Corporation, and $5,239.19 additional income 'From Sales.'

"During 1948, petitioner's activities in the United States included the following: (a) It collected dividends on Electrolux and Servel stock. (b) It made payments of principal and interest on outstanding loans. (c) In May it borrowed $1,000,000 from the Bank of America, which Wenner-Gren used in acquisition of Mexican telephone companies. (d) On August 6, it borrowed $1,850,000 from the Bank of America, of which it used $1,100,000 to repay prior indebtedness of Wenner-Gren to the bank, which petitioner had assumed. On that same date petitioner drew checks in excess of the balance of $750,000 to make payments of principal and interest on other outstanding indebtedness.

"During 1949, petitioner's activities in the United States included the following: (a) It collected dividends on Electrolux and Servel stock. (b) It made payments on principal and interest on outstanding loans. (c) It secured and repaid short-term advances from Turnbow. (d) In September it borrowed $1,700,000 from the Bank of America, used to liquidate the outstanding balances of two loans from that bank. (e) In December it sold its 55,000 shares of Servel stock, theretofore pledged with the Bank of America to secure loans. It used the proceeds of the sale to pay outstanding obligations to the bank.

"During 1950, petitioner's activities in the United States included the following: (a) It collected dividends on Electrolux stock. (b) It made payments on principal and interest on outstanding loans. (c) On January 3, it borrowed

$2,000,000 from the Central Hanover Bank. It used the bulk of this loan to repay the $1,700,000 loan from the Bank of America. It transferred approximately $400,000 to its account in Mexico City, $110,000 for the account of a Swedish bank, and aproximately $275,000 to its account at the Bank of America, much of which was thereafter transferred to petitioner's Mexican accounts. (d) Petitioner repaid the $2,000,000 loan. In its negotiations with the Central Hanover Bank, petitioner represented itself as a Panamanian corporation, doing business in foreign countries.

"The funds borrowed by petitioner were in the main used by Wenner-Gren. Turnbow had no direct knowledge of their use."

It will be noted that the activities described in the last four quoted paragraphs all relate to the corporation's investment in the stock of other corporations, the collection of dividends and the borrowing of money, some of which was used to acquire Mexican companies and some of which was used by Wenner-Gren. The taxpayer's filed returns stated that its principal activity was "Investment", and such a term would appear to describe the activities just listed.

On the basis of these facts, taken alone, there cannot be any question but that the petitioner corporation was not "engaged in trade or business" within the meaning of § 231. While the Internal Revenue Code did not specifically define "trade or business", yet the decisions have definitely established that where those terms are used elsewhere in

the income tax laws, they do not include such activities as those here described.

■ The leading case on this point arose out of a taxpayer's effort to deduct the expenses of managing his investments in stocks and bonds as expenses incurred "in carrying on any trade or business" under the provisions of § 23 (a) of the Revenue Act of 1932, 26 U.S. C.A. § 23(a). The Board of Tax Appeals upheld the Commissioner's refusal to permit the deduction. Said the Supreme Court: "The petitioner merely kept records and collected interest and dividends from his securities, through managerial attention for his investments. No matter how large the estate or how continuous or extended the work required may be, such facts are not sufficient as a matter of law to permit the courts to reverse the decision of the Board." Higgins v. Commissioner, 312 U.S. 212, 218, 61 S.Ct. 475, 478, 85 L.Ed. 783.[3] Since that decision it is fair to say that it is settled law that the mere management of investments and the collection of rents, interest, and dividends is insufficient to constitute the carrying on of a trade or business. See "Trade or Business Under Income Tax Laws," 3 Kan.L.R. 99, 114.

■ The meaning of the decision in the Higgins case was stated in Commissioner v. Smith, 2 Cir., 203 F.2d 310, 312, as follows: "The full-time management of one's investments does not constitute a trade or business." [4] This limited meaning of the phrase "trade or business" was plainly in the mind of Congress when the language of § 231 was last amended prior to the years here in

3. The decision in the Higgins case led to corrective legislation, and this was accomplished, not by redefining the terms "trade or business", but by adding subdivision 23(a) (2) permitting deduction of expenses incurred "for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income."

4. That was a case in which taxpayer sought to deduct as a loss for the taxable year a debt which became worthless during the year, claiming it to be a business

debt under § 23(k) (1) of Internal Revenue Code, 1939. Taxpayer had made extensive loans to and investments in numerous business enterprises. The court reversed a Tax Court decision for the taxpayer. Noting the history of the use, in the Code, of the term "trade or business", the court commented on its "restricted meaning" and said: "Although Congress has never defined the term 'trade or business', it is clear that this concept as used in § 23(k) does not encompass all activities engaged in for profit."

question. That amendment occurred in 1942. Prior to that time subdivision (b) provided the more advantageous rate of tax not merely for those foreign corporations "engaged in trade or business" within the United States, but also for those "having an office or place of business" within the United States. The 1942 amendment eliminated this provision relating to an office or place of business. The House report which accompanied the bill accomplishing that made it plain that the intended effect was to eliminate foreign corporations which were merely investing in the stock of domestic corporations from claiming the benefits of subdivision (b).[5]

There can be no doubt that, for the purposes of § 231, "trade or business" did not include the activities of petitioner which are described in the above quoted findings of the Tax Court.

This brings us to a consideration of some other activities of the petitioner,— activities referred to by the Tax Court as "isolated and noncontinuous" transactions. These were of three kinds: (1) In July, 1948, petitioner purchased a carload of dry milk fat from Kraft Foods Company for $46,212.75 and sold it one month later through one of Turnbow's companies for $40,248.[6] (2) As an accommodation to a Mexican corporation petitioner purchased, in 1950, equipment for that corporation for which it was reimbursed without profit. (3) In all three years petitioner bought tin cans for milk products which were needed by Supply, one of Turnbow's companies. The Tax Court summarized these can transactions as follows: "In each year, the only other activity reported by petitioner was represented by nominal amounts of income resulting from transactions relating to cans used by Supply. In 1948, such reported income amounted to $120.64; in 1949, $3,509.90; in 1950, $5,239.19." The first such can purchase occurred in December, 1948. Turnbow or Supply put in the order, but in petitioner's name. It paid for the cans and turned the cans to Supply for a five percent increase over the price it paid. This December 1948 transaction was repeated 37 times in 1949 and on 48 occasions in 1950. Said the Tax Court: "There was no business purpose connected with the can transactions engaged in by petitioner. It never used its Nevada office in these operations. It carried no inventory of cans and ordered no cans other than those used by Supply. In every instance in which Supply acquired cans in this way, it paid petitioner within 10 days of petitioner's payment to Western. After 1950, Supply recom-

---

5. The report stated: "Under existing law, nonresident aliens and foreign corporations are divided into two classes: (a) Those not engaged in trade or business within the United States and not having an office or place of business therein and (b) those engaged in trade or business within the United States or having an office or place of business therein. Those in class (a) are taxed at a flat rate on fixed and determinable income while those in class (b) are subject to tax at the corporate rate applicable to domestic corporations.

"A tendency has arisen, principally on the part of foreign corporations which are substantial holders of the stock of domestic corporations and, occasionally on the part of nonresident alien individuals, to attempt to establish that they have an 'office or place of business' within the United States and hence secure the very different tax treatment accorded taxpayers within class (b). Since such corporations and individuals engage in no other economic activities in the United States, they can not be said to be engaged in trade or business within the United States.

"It appears to your committee to be in the interests of good administration to establish but one test (as is done with respect to capital stock tax in section 1200) in ascertaining the classification of foreign entities, namely, whether or not it is engaged in trade or business within the United States. Such amendment narrows sharply the field of uncertainty arising in such cases and removes a possible avenue of tax avoidance to large foreign corporate and other holders of domestic securities." 1942-2 C.B. 372, 449.

6. Speaking of this the Tax Court said: "In July 1948, petitioner engaged in a transaction of a type in which it was not previously nor subsequently engaged."

menced ordering and purchasing of cans directly from Western."

We think it was within the competence of the Tax Court to find that these facts were insufficient to show that petitioner was engaged in trade or business within the United States. The court found these milk fat, equipment and milk can transactions, because they were "of an isolated and noncontinuous nature", and because they were "dictated not by a business objective but purely by a desire to save taxes," [7] did not amount to activities sufficient to bring petitioner within the definition of § 231(b). Wholly apart from any question of "business purpose", it seems plain that whether these milk fat, milk can transactions were properly to be regarded, in the light of the corporation's whole enterprise, as casual or incidental transactions, was a question of fact. And further, whether as such, those transactions served to change an otherwise "non-trade or business" corporation into one within § 231(b) is also a question of fact.

In Linen Thread Co. v. Commissioner, 2 Cir., 128 F.2d 166, 168, the court was considering the validity of a Regulation defining the term "office or place of business" as used in § 231(b) before its amendment. It then provided: "A foreign corporation engaged in trade or business within the United States or having an office or place of business therein shall be taxable as provided in section 14(e)(1)." The Regulation recited: "The term 'office or place of business', however, implies a place for the regular transaction of business and does not include a place where casual or incidental transactions might be, or are, effected." The court said: "The regulations are valid because reasonable and *within the fair meaning of the statute.*" See, accord, Linen Thread Co. v. Commissioner, 2 Cir., 152 F.2d 625.

For a like reason we think the Tax Court's holding that casual or incidental transactions (such as these milk fat and milk can matters) are not sufficient to show the corporation to be "engaged in trade or business", was within the fair meaning of the statute.

The Tax Court's decision was filed on September 4, 1957. On October 21, 1957 petitioner retained new counsel. He studied the record and reached the conclusion that "not all of the available facts were presented with reference to the issue decided by the Court," and so, although the 30 days allowed by the Tax Court's rules for making such a motion had long since passed, counsel moved for leave to file a motion to vacate the decision and reopen the proceeding for further testimony.[8] It is claimed the court erred in denying the motion.

---

7. On this point the court cited Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596.

8. The proposed motion was stated to be on the following grounds: "In support of these motions, it is averred that:

"1. The Memorandum Findings of Fact and Opinion of this Court in the above-entitled proceedings was filed on August 30, 1957.

"2. The decision in this proceeding was filed on September 4, 1957.

"3. The undersigned was retained as counsel by the petitioner on October 21, 1957 to prosecute an appeal from the decision of this Court to the United States Court of Appeals for the Ninth Circuit.

"4. Such an appeal would have to be filed not later than December 4, 1957.

"5. In the process of reviewing the files relating to this proceeding with reference to filing the appeal above-mentioned, the conclusion has been reached that not all of the available facts were presented with reference to the issue decided by the Court. In addition, the testimony of Axel L. Wenner-Gren, the principal party at interest, was neither sought nor presented to the Court. Wenner-Gren is and was available to testify and could testify of his own knowledge to certain relevant facts in connection with the issue in the proceeding. . . .

"It further appears to the undersigned that in some instances the facts presented were not presented in the most favorable light. In this connection see the affidavit of Birger Strid, attached.

"It is believed that a more complete, accurate and informative presentation of relevant facts could be made if these motions were granted and the decision vacated and the proceeding set for the taking of further testimony."

**46**

The argument is groundless. Granting such a motion would at best be purely discretionary, none of the matters new counsel thought should have been presented were newly discovered, or unknown to petitioner or its representatives at the time of the hearing. Finally, there was no showing what the additional evidence would be, if taken, nor whether it would alter the picture of petitioner's activities.

Affirmed.

DENMAN, Circuit Judge, did not participate in this opinion.