787 F.2d 128
 54 USLW 2527, 7 Employee Benefits Ca 1273
 UNITED RETAIL & WHOLESALE EMPLOYEES TEAMSTERS UNION LOCAL
NO. 115 PENSION PLAN and Robert E. Zimmer, Michael Paolella,
John P. Morris and James Smith, Jr., Trustees of the United
Retail & Wholesale Employees Teamsters Union Local No. 115
Pension Plan, Appellees/Cross-Appellants,
v.
YAHN & Mc DONNELL, INC. and the Pennstar Company, Appellants
in 85-1035/Cross- Appellees.
 Nos. 85-1035, 85-1065.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 12, 1985.
Decided March 31, 1986.
Rehearing and Rehearing In Banc Denied April 23, 1986.
 
 Paula R. Markowitz (Argued), Richard H. Markowitz, Markowitz & Richman, Philadelphia, Pa., for appellees/cross-appellants.
 William H. Ewing (Argued), Hangley, Connolly, Epstein, Chicco Foxman & Ewing, Philadelphia, Pa., for appellants in No. 85-1035/cross-appellees.
 Before SEITZ and BECKER, Circuit Judges, and ROSENN, Senior Circuit Judge.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This case presents three important questions concerning the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. Sec. 1381 et seq. (1982): 1) whether MPPAA authorizes a right of action to collect withdrawal liability payments pending arbitration proceedings at which employers withdrawing from the plan may challenge assessments of withdrawal liability made by plan trustees; 2) whether the statutory scheme, under which the determination of withdrawal liability is made by trustees who themselves owe a fiduciary duty to the plan, and whose findings must be presumed correct by the arbitrator, deprives withdrawing employers of an impartial tribunal in violation of their procedural due process rights under the Fifth Amendment (and whether the alleged offending provisions are severable from the statutory scheme); and 3) whether MPPAA makes an award of attorney's fees, liquidated damages and costs mandatory upon an entry of a judgment for delinquent payments in favor of a pension plan, even though arbitration and review of arbitration in the district court have yet to take place. The district court held that withdrawal liability may be pursued in court prior to arbitration; that MPPAA comports with the constitutional requirement of due process; and that it would be premature to award a pension plan attorney's fees, liquidated damages and costs prior to the final resolution of the controversy.
 
 
 2
 We agree with the district court that MPPAA provides for a cause of action to collect withdrawal liability pending arbitration. We find, however, that the scheme violates the due process rights of withdrawing employers. We further find that the scheme is severable, and accordingly strike down only the portion of the scheme that requires the arbitrator to accord the trustees' determination of withdrawal liability a presumption of correctness. Finally, we hold that once the district court granted judgment for delinquent payments in favor of the pension plan, it was required to award attorney's fees, liquidated damages and costs even though the matter had yet to go to arbitration. Accordingly, we affirm in part and reverse in part.
 
 
 3
 Because of MPPAA's complexity, we must commence our analysis with a rather detailed description of its historical background and statutory scheme.
 
 I. HISTORICAL BACKGROUND & STATUTORY SCHEME
 
 4
 Under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Sec. 1001 et seq. (1976), amended by 29 U.S.C. Sec. 1301 et seq. (1982), employers contribute to a pension plan on behalf of each of their employees who is a member of a participating union. The amount of the payments is determined by a collective bargaining agreement between each employer and its employees. The plan is administered by trustees, half of whom are chosen by contributing employers and half by the union. 29 U.S.C. Sec. 186(c)(5)(B). The trustees set the level of benefits paid to participants and determine investment policy. ERISA also established the Pension Benefit Guaranty Corporation ("PBGC"), a government corporation, to insure employees' benefits against a plan's termination for insufficient funds.
 
 
 5
 Prior to MPPAA, 29 U.S.C. Sec. 1381 et seq. (1982), an employer who withdrew from a pension plan incurred a contingent liability: if a multiemployer plan terminated within five years following an employer's withdrawal, the employer was liable to the PBGC, but if the plan did not terminate within five years, the employer had no liability. The maximum of each employer's liability was 30% of its net worth. Because an employer who withdrew from a plan more than five years prior to its termination escaped with no liability, the remaining employers bore a greater share of liability. There was thus an incentive for employers to withdraw from plans in order to avoid future liability. Many withdrawals resulted, and the solvency of pension plans was threatened.
 
 
 6
 In 1980, Congress passed MPPAA, amending ERISA, to discourage withdrawals from multiemployer pension plans and to ensure the solvency of such plans. H.R.Rep. No. 869, 96th Cong.2d Sess. 67, reprinted in 1980 U.S.Code Cong. & Ad.News 2918, 2935. MPPAA, inter alia, imposed mandatory liability on withdrawing employers regardless of whether the plan terminated, and repealed the provision that set 30% of an employer's net worth as its maximum liability. Because MPPAA was signed into law on September 26, 1980, but imposed retroactive liability on employers who ceased contributing to a plan on or after April 29, 1980, in a worst case scenario an employer could be liable for all of its assets even if the plan remained solvent and even if the employer had left the pension plan prior to the enactment of MPPAA.[1]
 
 
 7
 Title 29, Sec. 1381 provides that upon an employer's withdrawal from a pension plan, the plan's trustees determine the amount of liability. In determining the amount of liability, the trustees are required to use one of several actuarial methods set forth in Sec. 1391 or any alternative method approved of by the PBGC. 29 U.S.C. Sec. 1391(c)(1) (1982). Section 1394(a) prohibits the retroactive application of a method chosen after the date of the employer's withdrawal and Section 1394(b) requires that the selected method be applied uniformly to all employers who withdraw from the plan.
 
 
 8
 Once an employer's withdrawal liability is calculated, the plan is required to notify the employer and demand payment on an installment schedule. 29 U.S.C. Sec. 1399(b)(1). After the employer receives notice of the amount of his withdrawal liability, it may, within ninety days, ask for a review by the plan's trustees. 29 U.S.C. 1399(b)(2)(A). After a "reasonable review," the trustees must notify the employer of their determination. 29 U.S.C. 1399(b)(2)(B). If a dispute persists, either party may initiate arbitration proceedings, in which the trustees' determination is presumed correct unless the party contesting it shows "by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." 29 U.S.C. Sec. 1401(a)(3)(A). Section 1401(c) provides that the arbitrator's decision is subject to review in a district court where there is also a presumption, rebuttable by a clear preponderance of the evidence, that the arbitrator's factual findings are correct.
 
 
 9
 Under Secs. 1399(c)(2) and 1401, the employer must commence payments within 60 days of being informed of its liability, regardless of whether a review has been requested or arbitration proceedings initiated. Under Sec. 1132(g), if the plan wins judgment for a delinquent payment, attorney's fees and other costs must be paid by the employer.
 
 II. FACTUAL AND PROCEDURAL HISTORY
 
 10
 In December 1980, appellant Yahn & McDonnell, Inc. ("Yahn") and Teamsters Union Local No. 115 entered into a collective bargaining agreement requiring Yahn to make specified weekly contributions to the union's ERISA pension plan, Teamsters Union Local No. 115 Pension Plan ("the Plan"), appellees in this action, on behalf of all of Yahn's employees who were members of Local 115. Yahn made all plan contributions expressly required by the collective bargaining agreement. The agreement itself does not provide for the imposition of withdrawal liability. The pension plan was administered by four trustees, two appointed by Local 115 and two appointed by contributing employers.
 
 
 11
 In November 1981, Yahn ceased operations and withdrew from the pension plan. In April 1982, the Plan demanded withdrawal liability totalling almost $458,000, and informed Yahn that the Plan had the right to look to a parent company for payment if Yahn could not pay.[2] In July, Yahn requested a review, raising several issues, e.g., whether Yahn's liability might be reduced by its poor financial condition and/or the fact that most of its employees who were members of Local 115 had been hired by another company which had contributed and was continuing to contribute to the pension plan. After conducting the review, the trustees notified Yahn that its assessment would not be altered. On January 31, 1983, the Plan informed Yahn that if Yahn failed to make liability payments, the Plan would file suit within 60 days. Yahn demanded arbitration, and informed the Plan of its intention to challenge the constitutionality of MPPAA in district court. The parties agreed to hold arbitration in abeyance pending resolution of the constitutional issues. In April 1983, the Plan brought suit in the district court for the Eastern District of Pennsylvania against Yahn seeking a withdrawal liability payment.
 
 
 12
 In the district court Yahn argued that MPPAA does not confer a right of action to collect withdrawal liability payments while arbitration is pending. Yahn also argued that MPPAA denied it due process because the initial determination of liability is made by biased trustees. Yahn maintained that the right of appeal to an arbitrator and a district court did not eliminate the bias because the trustees' determination is presumed to be correct under the Act and must be reviewed deferentially in arbitration and in the district court. Additionally, Yahn filed a counterclaim alleging that the trustees, by pledging benefits that were not fully funded, had been negligent in their management of the pension fund.
 
 
 13
 After considering the submissions of the parties, the district court filed a memorandum and order in which it: 1) granted summary judgment against Yahn; 2) held that MPPAA does not violate procedural due process; 3) denied the Plan's request for attorney's fees, liquidated damages and costs; and 4) dismissed Yahn's counterclaim, noting that it would be resolved at arbitration. Shortly thereafter it entered judgment against Yahn in the sum of $258,000. Yahn has appealed the district court's judgment with respect to withdrawal liability and the constitutionality of MPPAA.[3] The Plan has cross-appealed, alleging that the district court erred in denying it attorney's fees, costs, and liquidated damages.[4]
 
 
 14
 III. PROPRIETY OF A CAUSE OF ACTION PENDING ARBITRATION
 
 
 15
 We turn first to the question whether MPPAA authorizes a right of action to collect withdrawal liability payments pending arbitration. The statutory scheme is unclear on this point. See Republic Industries v. Teamsters Joint Council No. 83, 718 F.2d 628, 641-42 n. 16 (4th Cir.1983). Several provisions strongly suggest that there is such a cause of action. Section 1399(c)(2) says "Withdrawal liability shall be payable in accordance with the schedule set forth by the plan ... no later than 60 days after the date of the demand notwithstanding any request for review or appeal...." Section 1401(d) is perhaps even more to the point:
 
 
 16
 Payments shall be made by an employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination.
 
 
 17
 (emphasis added). These sections explicitly provide for payments pending the arbitrator's decision, and would appear meaningless if there were no cause of action to enforce them.[5] Indeed, Sec. 1451(a)(1) establishes such a cause of action, saying that "[A] plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or omission of any party ... may bring an action for appropriate legal or equitable relief, or both."
 
 
 18
 Yahn argues that these provisions establish retroactive payments plus interest in the event that the arbitrator affirms a finding of liability, and that pension plans, therefore, are not "adversely affected" within the meaning of Sec. 1451 until after the arbitrator's decision. This position requires downplaying a plan's cash/flow problems. In Pantry Pride v. Retail Clerks Tri-State Pension Fund, 747 F.2d 169, 171 (3d Cir.1984), we emphasized Congress' concern with an uninterrupted flow of pension payments, and implicitly recognized that there is a cause of action to collect interim liability pending arbitration. In that case, an employer filed suit challenging the assessment of withdrawal liability, and the plan moved for withdrawal payments during litigation. The district court limited payments to an amount less than the schedule set forth by the plan trustees. On appeal we were faced with the threshold question whether that holding was appealable as an interlocutory order. We said:
 
 
 19
 [T]he denial of the claim to interim withdrawal benefits is a serious one. Congress believed that it was important to insure that the flow of employer withdrawal liability payments was not delayed by an employer disputing liability.... If no interlocutory review were possible, the Fund could effectively lose its statutory protection against interruptions in the pre-arbitration flow of contributions that Congress mandated through the interim liability provisions.
 
 
 20
 Id. at 171 (emphasis added).
 
 
 21
 Because the pension plan had not filed a counterclaim, we held that the district court should not have addressed the question of interim liability payments at all. However, as the quoted passage makes clear, we implicitly recognized that there is a cause of action to collect withdrawal liability pending arbitration (Judge Hunter went further, dissenting on the grounds that MPPAA made it mandatory upon the court to order withdrawal liability payments notwithstanding deficiency in the plan's pleadings). The courts which have considered this question directly have reached the same conclusion. See Trustees of the Retirement Fund of the Fur Manufacturing Industry v. Lazar-Wisotzky, Inc., 550 F.Supp. 35 (S.D.N.Y.1982), aff'd without opinion, 738 F.2d 419 (2d Cir.1984); Commission Drivers Local 187 Pension Fund v. Hertz Corp., 3 EBC 1801 (E.D.Pa.1982).
 
 
 22
 On the other hand, there is strong language in the statutory scheme contradicting the apparent implication of Secs. 1399(c), 1401(d) and 1451 that there is a cause of action to collect withdrawal liability payments pending arbitration. Specifically, Sec. 1401(b) provides:
 
 
 23
 1) If no arbitration proceeding has been initiated pursuant to subsection (a) of this section, the amounts demanded by the plan sponsor under section 1399(b)(1) of this title shall be due and owing on the schedule set forth by the plan sponsor. The plan sponsor may bring an action in a State or Federal court of competent jurisdiction for collection.
 
 
 24
 2) Upon completion of the arbitration proceedings ... any party thereto may bring an action ... to enforce, vacate or modify the arbitrator's award....
 
 
 25
 (emphasis added).
 
 
 26
 By explicitly conferring a right of action to collect payments only "If no arbitration proceeding has been initiated," and "Upon completion of the arbitration proceedings," Section 1401(b) can be read to imply that no such right of action exists prior to arbitration.[6]
 
 
 27
 While the conflicting provisions within MPPAA render this question difficult, we have found strong authority for the proposition that there is a cause of action to collect withdrawal liability payments pending arbitration. In addition to the courts in Pantry Pride, Hertz and Lazar-Wisotzky, the PBGC, while acknowledging the lack of clarity on this point in the statutory scheme, has stated its view that there exists a right of action to collect payments pending arbitration. 49 Fed.Reg. 22,644 (1984). In light of Congress' obvious desire to ensure the solvency and stability of pension plans, see supra p. 130, we believe this statutory interpretation is correct. Accordingly, we will affirm the district court's grant of summary judgment for the Plan with respect to an interim liability payment. However, we hope that Congress will soon clarify the confusion resulting from conflicting provisions within MPPAA.[7]
 
 
 28
 IV. ATTORNEY'S FEES, LIQUIDATED DAMAGES, AND COSTS
 
 
 29
 After granting summary judgment for the Plan with respect to Yahn's withdrawal liability, the district court considered the Plan's application for attorney's fees, liquidated damages and costs, and determined that an award on such matters would be premature because arbitration had yet to take place. The Plan asserts that the district court erred because MPPAA compels the award of attorney's fees, liquidated damages and costs upon a judgment in favor of a pension plan for delinquent payments.
 
 
 30
 Section 1451(b) provides that failure to make withdrawal liability payments shall be treated as delinquency in contribution within the meaning of Sec. 1145. Thus, the Plan's suit in district court was an action to enforce a delinquent contribution under Sec. 1145. Section 1132(g)(2) provides:
 
 
 31
 In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan
 
 
 32
 (C) an amount equal to the greater of--
 
 
 33
 * * *
 
 
 34
 (ii) liquidated damages ...
 
 
 35
 (D) reasonable attorney's fees and costs of the action, to be paid by the defendant
 
 
 36
 ....
 
 
 37
 (emphasis added). The language of this section is mandatory. The fact that it amended a section that gave the judge discretion to award such fees buttresses the conclusion that Sec. 1132 made attorney's fees, costs and liquidated damages mandatory upon a judgment in favor of a pension plan. Moreover, Section 1132(g)(1) states that in any action by a participant, beneficiary or fiduciary of a plan other than an action to recover a delinquent payment, an award of attorney's fees and costs is discretionary with the judge. This section implies that in the case of an action to recover a delinquent payment, an award of fees and costs is mandatory.
 
 
 38
 Because of the clear language of the statute, we join the Second, Fifth and Ninth Circuits in holding that in successful actions for delinquent payments, "attorney's fees are no longer discretionary." Operating Engineers Pension Trust v. Reed, 726 F.2d 513, 514 (9th Cir.1984). Accord O'Hare v. General Marine Transport Corp, 740 F.2d 160, 171 (2d Cir.1984); Carpenters Amended and Restated Health Benefit Fund v. John W. Ryan Construction Co., Inc., 767 F.2d 1170 (5th Cir.1985).[8] Nor was there any basis for the district court to defer these awards until after arbitration or review in the district court. As we have noted, the award of costs and attorney's fees is related only to the judgment for delinquent payments. Having already entered that judgment, the district court had at its disposal all of the material relevant to a determination of costs and attorney's fees. Furthermore, while the arbitrator could find that Yahn should not have been assessed withdrawal liability by the trustees (or should have been assessed a lesser amount of liability) and thus order a refund, the arbitrator cannot overturn the district court's finding that Yahn was obligated to make payments pending the arbitrator's decision. See Part III supra.
 
 V. THE PROCEDURAL DUE PROCESS CHALLENGE
 A. Background; Keith Fulton Case
 
 39
 The constitutional question before us is whether the MPPAA denies procedural due process to withdrawing employers; more specifically, whether the determination of liability by trustees who owe a fiduciary duty to the plan and thus are putatively predisposed to impose excessive liability on withdrawing employers, coupled with the presumption in favor of that determination in arbitration and the further deference given the arbitrator's decision in district court,[9] results in the denial of due process to withdrawing employers.
 
 
 40
 The provisions of MPPAA have given rise to many other constitutional challenges, which the Supreme Court and this court have resolved in favor of constitutionality.[10] Neither this court nor the Supreme Court, however, has addressed the procedural due process rights of withdrawing employers, the question with which we are squarely confronted here.
 
 
 41
 This question has been considered by five circuits, all of which have upheld the constitutionality of MPPAA. Textile Workers Pension Fund v. Standard Dye & Finishing Co., 725 F.2d 843, 854-55 (2d Cir.1984); Washington Star Co. v. Int'l Typographical Union Negotiated Pension Plan, 729 F.2d 1502, 1511 (D.C.Cir.1984); Republic Industries, Inc. v. Teamsters Joint Council No. 83, 718 F.2d 628, 639-42 (4th Cir.1983); Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. Thompson Building Materials, Inc., 749 F.2d 1396, 1403-04 (9th Cir.1984); Keith Fulton & Sons, Inc. v. New England Teamsters and Trucking Industry Pension Fund, 762 F.2d 1137 (1st Cir.1985) (en banc ).[11] We do not lightly find a constitutional deficiency in a statutory scheme that has been upheld by five circuits. Our difference is diminished, however, by the fact that all but one of these cases have dealt with the procedural due process challenge to MPPAA only in passing, in cases dominated by other claims. The important exception is the First Circuit's Keith Fulton, in which Judge Coffin's majority opinion and Judge Aldrich's dissent thoughtfully and comprehensively set forth the opposing positions.[12] It is useful to commence our analysis with a summary of their respective arguments.
 
 
 42
 Judge Coffin began his analysis by invoking the doctrine of Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), that legislative acts adjusting the burdens and benefits of economic life survive constitutional scrutiny unless they are arbitrary or irrational. Keith Fulton, 762 F.2d at 1140. He proceeded to explain why the procedures established for determining withdrawal liability are not unreasonable. First, he argued that because Congress has set forth the actuarial methods to be used by plan trustees, and because the method adopted must be uniformly applied to withdrawing employers, the trustees' discretion is significantly cabined. Id. at 1141. Second, he disputed that the trustees are unduly biased against withdrawing employers. Id. at 1142-43. He noted first that half of the trustees are selected by contributing employers and would thus be sympathetic to withdrawing employers. He argued further that trustees will recognize that excessive assessments of withdrawal liability would discourage employers from joining the plan in the future. He argued, too, that because Congress indisputably could have mandated that the harshest method for computing liability be used for all withdrawing employers, permitting the trustees to choose among that alternative and less harsh methods cannot violate due process. Id. at 1144.
 
 
 43
 Judge Coffin viewed the presumptions in favor of the trustees' determination as reasonably calculated to discourage litigation and produce uniformity. Id. at 1143-44. He implicitly argued that Congress had made a legitimate tradeoff between efficiency and fairness, promoting the former at the expense of the latter. Judge Coffin concluded that Congress took measures to address a growing problem, that these measures were reasonably related to Congress' important goals, and that while some unfairness may have resulted, it did not rise to the level of a constitutional violation. Id. at 1146.
 
 
 44
 Judge Aldrich took issue with each of these points. He disagreed with the claim that the trustees do not have significant discretion, emphasizing their freedom to choose the discount rate (for determining future values) with which each withdrawing employer's liability is calculated. Id. at 1149. The discount rate, of course, has serious financial ramifications. Judge Aldrich noted that, in the case before them, the trustees had selected a discount rate of 7.5 per cent while the fund's actuary admitted that 14.5 per cent would have been equally reasonable. Id. at 1150.
 
 
 45
 He also strongly disputed the notion that the trustees are not overly biased, pointing out that all of the trustees, including those selected by employers, legally owe a fiduciary duty to the fund. Id. at 1148. Whereas Judge Coffin viewed the presumption of correctness accorded the trustees' determination as a legitimate, efficiency-promoting device, Judge Aldrich viewed it as perpetuating the problem of bias by insulating the trustees' tainted finding from necessary scrutiny. Id. at 1151.
 
 
 46
 Judge Aldrich dismissed as irrelevant the fact that Congress could have chosen to apply the harshest method to all withdrawing employers, because the issue is the fairness of the process, not the reasonableness of the result. Id. He concluded with a flourish that the withdrawing employers participate in an event where "the referee has been fixed." Id.
 
 
 47
 While we believe that some of the Keith Fulton majority's arguments are strong, for the reasons that follow we are persuaded that Judge Aldrich's analysis is closer to the mark.
 
 B. The Appropriate Inquiry
 
 48
 We note at the outset our view that the majority in Keith Fulton blurred the critical distinction between substantive due process and procedural due process. It repeatedly invoked Turner Elkhorn in support of some variation on the theme that as long as Congress acts reasonably, the due process requirement is met. Turner Elkhorn and its progeny, however, deal with substantive due process challenges, not procedural due process. They stand for the proposition that Congress cannot irrationally or arbitrarily rearrange economic benefits and costs. A procedural due process challenge, however, concerns the adequacy and fairness of the mandated procedures. Schweiker v. McClure, 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982); Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).
 
 
 49
 The district court in the case at bar did not confuse substantive and procedural due process but made an equally significant error by failing to distinguish between two kinds of procedural due process violations: those that arise from insufficient procedural safeguards and those that arise from decisionmaker bias. It is well established that procedures that insufficiently protect against error may violate due process. See Mathews, supra. In addition, it is well-settled that "due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities." McClure, 456 U.S. at 195, 102 S.Ct. at 1669.
 
 
 50
 These two sources of procedural due process violations have given rise to two separate branches of jurisprudence. The appropriate analysis for cases involving allegations of procedures that inadequately guard against error is the balancing test set forth in Mathews. This test requires the court to balance the risk of an erroneous deprivation, the weight of the individual's interest, and the burden on the state of imposing additional safeguards. 424 U.S. at 335, 96 S.Ct. at 903.
 
 
 51
 A Mathews balancing test, however, is not the appropriate inquiry when the due process claim involves an allegation of biased decisionmakers. Mathews involved only allegations of insufficient procedural safeguards, not allegations of a biased decisionmaker. The Mathews Court made no comment on the line of cases that indisputably establish the right to an impartial tribunal. See Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) (optometrist disciplined by Alabama Board of Optometrists was denied right to an impartial hearing when members of Board had pecuniary interest in outcome); Ward v. Village of Monroeville, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) (individual convicted of traffic violation was denied impartial hearing when Mayor sat as judge); See also Withrow v. Larkin, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); In Re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955); Tumey v. State Of Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). Indeed, since Mathews, the Supreme Court has had several occasions to consider claims of due process violations based on allegations of a biased decisionmaker; in none of these cases has the Court resorted to the Mathews balancing test to resolve that issue. Schweiker v. McClure, 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982); Marshall v. Jerrico, 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980); Friedman v. Rogers, 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979).[13]
 
 
 52
 If the only problem with biased decisionmakers was the likelihood of error, it would make sense to apply the Mathews balancing test in cases involving allegations of biased decisionmakers and to subsume the problem of bias under the "risk of erroneous deprivation" prong of the three-part test. However, the requirement of an impartial decisionmaker transcends concern for diminishing the likelihood of error. The unfairness that results from biased decisionmakers strikes so deeply at our sense of justice that it differs qualitatively from the injury that results from insufficient procedures. In Justice Holmes' famous phrase, "even a dog distinguishes between being stumbled over and being kicked." O. Holmes, The Common Law 3 (1881).
 
 
 53
 In the case at bar, Yahn challenges primarily the impartiality of the tribunal. Therefore, following Supreme Court jurisprudence, the Mathews balancing test is not the primary inquiry. If someone is deprived of his right to an impartial tribunal, then he is denied his constitutional right to due process, regardless of the magnitude of the individual and state interest at stake, the risk of error and the likely value of additional safeguards (the factors to be balanced under Mathews ). Since the district court erred by dealing with Yahn's due process claim by applying a Mathews test, we turn our attention to Yahn's claim that it was deprived of its right to an impartial decision-maker.
 
 C. The Right To An Impartial Decisionmaker
 
 54
 Our inquiry is twofold: 1) whether there is a sufficient showing of trustee bias; and 2) whether the fact that the trustees do not have wide discretion and/or the availability of an arbitrator's review suffice to eliminate the bias and thus provide due process even if the trustees are biased.
 
 1. Trustee Bias
 
 55
 Although there is a presumption that decisionmakers are unbiased, that presumption can be rebutted by a "showing of conflict of interest or some other specific reason." McClure, 456 U.S. at 195, 102 S.Ct. at 1669. There is powerful evidence that the trustees have a significant conflict of interest: as fiduciaries of the plan, trustees have a natural inclination and may even consider it a duty to maximize the fund by extracting as much money as possible from withdrawing employers. Absent countervailing factors, this "possible temptation," Ward v. Village of Monroeville, 409 U.S. 57, 60, 93 S.Ct. 80, 83, 34 L.Ed.2d 267 (1972), and incentive to maximize withdrawal liability of employers results in the denial of withdrawing employers' due process right to an impartial decisionmaker.
 
 
 56
 Some courts have countered that while the trustees appointed by the union may be biased against withdrawing employers, the trustees selected by contributing employers will feel an allegiance to withdrawing employers which will counteract the bias of the other trustees. Keith Fulton, 762 F.2d at 1142; Republic Industries, 718 F.2d at 640.[14] We must reject this argument, because all of the trustees, including those selected by employers, are fiduciaries of the fund, 29 U.S.C. Sec. 1002(21)(a), and thus owe an exclusive duty to the fund. 29 U.S.C. Sec. 1104. The Supreme Court has emphatically rejected the suggestion that trustees selected by contributing employers have any loyalty except to the fund:
 
 
 57
 [A]lthough Sec. 302(c)(5)(B) requires an equal balance between trustees appointed by the union and those appointed by the employer, nothing in the language of Sec. 302(c)(5) reveals any congressional intent that a trustee should or may administer a trust fund in the interest of the party that appointed him, or that an employer may direct or supervise the decisions of a trustee he has appointed.
 
 
 58
 NLRB v. Amax Coal, 453 U.S. 322, 330, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672 (1981). Indeed, under Sec. 1109, the trustees are potentially personally liable to the fund. See Massachusetts Mutual Life Insurance Company v. Russell, --- U.S. ----, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). Under these circumstances, their conflict of interest is at least as great and arguably greater than the Mayor in the Ward case who was deemed unsuited to preside over a traffic violation case because of his interest in maximizing the municipal budget.
 
 
 59
 It is conceivable that despite their exclusive loyalty to the fund, the trustees will be led by self-interest to refrain from unfairly maximizing assessments of withdrawal liability. As the Keith Fulton court suggested, the trustees are aware that "excessively high withdrawal liabilities ... would have the effect of discouraging future participation." 762 F.2d at 1142-43. However, this possibility does not mean the trustees are less biased, only that their manifest bias will not always result in gross injustice to employers. We agree with Judge Aldrich:
 
 
 60
 It seems an odd principle to determine the permissibility of manifest bias by weighing the decisionmaker's conflicting interests in the scales of justice and finding which side predominates.
 
 
 61
 Keith Fulton, 762 F.2d at 1149-1150. The due process right to an unbiased decisionmaker is not satisfied by speculation that countervailing concerns may restrain clearly biased parties from excessively harsh judgments.[15]
 
 
 62
 Even in cases in which the Supreme Court has rejected allegations of decisionmaker bias, its language strongly suggests that it would regard the Plan trustees as biased. In Friedman v. Rogers, 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979), the Court rejected an optometrist's claim that the Texas Optometry Disciplining Board was biased, because he failed to show "the possibility that the members of the regulatory board might have personal interests that precluded a fair and impartial hearing...." Id. at 18, 99 S.Ct. at 898. The Court endorsed the holding in Gibson v. Berryhill, 411 U.S. 564, 578, 93 S.Ct. 1689, 1697, 36 L.Ed.2d 488 (1973) where a conflict of interest had been shown and the Court had found a denial of due process (In Gibson, members of the Alabama Board of Optometrists stood to profit by revoking the licenses of their competitors). Similarly, in McClure, supra, where the impartiality of social security hearing officers was questioned, the Court said that "[i]n the absence of proof of financial interest ... there is no basis for assuming a derivative bias among their hearing officers." 456 U.S. at 197, 102 S.Ct. at 1671 (emphasis added).[16] Thus, the Court has not retreated from its holdings in Ward and Gibson, where the showing of conflict of interest was demonstrable. As discussed, the case at bar involves decisionmakers with a manifest and significant bias.
 
 
 63
 Some of the courts that have considered the procedural due process challenge to MPPAA have underestimated the significance of the trustees' fiduciary duty. The Supreme Court's declaration in Amax leaves little doubt as to the question of trustee bias:
 
 
 64
 Under principles of equity, a trustee bears an unwavering duty of complete loyalty to the beneficiary of the trust, to the exclusion of the interests of all other parties.
 
 
 65
 453 U.S. at 329, 101 S.Ct. at 2794. Given the trustees' fiduciary duty to the plan, and their consequent personal liability if the plan is not adequately funded, we again find ourselves in agreement with Judge Aldrich:
 
 
 66
 This is not a mere appearance of bias; it is a real, indeed multiple, bias, rooted both in the trustees' statutory duty and in their personal circumstances.
 
 
 67
 Keith Fulton, 762 F.2d at 1148.
 
 
 68
 In view of the bias of the trustees, MPPAA can pass constitutional muster only if the trustees lack discretion or if arbitration serves as a cleansing device. We take these points up in turn.
 
 2. Trustee Discretion
 
 69
 An important element of the First Circuit's holding that MPPAA provided due process was its belief that the trustees' calculation was largely ministerial:
 
 
 70
 The Act specifically requires that a plan's rules for determining withdrawal liability "operate and be applied uniformly with respect to each employer." 29 U.S.C. Sec. 1394(b).... Thus, in future years, the trustee's function is likely to become that of simply applying a designated method of computation to all later withdrawals.
 
 
 71
 Keith Fulton, 762 F.2d at 1141. See also Board of Trustees of the Western Conference, 749 F.2d at 1403-04; Republic Industries, 718 F.2d at 640 n. 13. If the trustees had no discretion, their bias would obviously be insignificant. Moreover, if, as the First Circuit believes, they have little discretion, an extra layer of review--arbitration--may ensure due process. However, we disagree with the First Circuit's assessment of the trustees' role, believing instead that the trustees have wide and significant discretion.
 
 
 72
 While the trustees must apply their chosen actuarial method uniformly among withdrawn employers, the statute leaves them free to pick among the four suggested methods or to choose their own. Moreover, as Judge Aldrich emphasized, determinations of appropriate discount rates, a matter that varies in each case, may involve large amounts of money. In Keith Fulton, the trustees had selected a discount rate of 7.5% although expert testimony suggested that a rate of 14.5% would have been reasonable. The difference between the two accounted for a gap of a considerable amount. Additionally, assessments under Secs. 1382-1399 require trustees to determine whether an employer falls under one of several statutory exemptions. This decision involves complex determinations such as whether a sale of assets is a bona fide arm's length deal. 29 U.S.C. Sec. 1384 (1982).[17]
 
 
 73
 Not only are these matters in which the exercise of significant discretion is unavoidable, but the trustees' determination can be the difference between a finding of no liability and a finding of liability in a large amount. The need to make such determinations belies the notion that the trustees perform a largely ministerial function. Indeed, the legislative history of MPPAA reveals that Congress expected the trustees to exercise wide discretion. Congress realized that "[p]lan fiduciaries are given a great deal of flexibility to strike a balance among the competing considerations of encouraging new entrants, discouraging withdrawals, easing administrative burdens, and protecting the financial soundness of a fund." H.R.Rep No. 869, 96th Cong., 2d Sess. 67, reprinted in 1980 U.S.Code Cong. & Ad.News 2935.
 
 
 74
 We conclude that the due process problem occasioned by the trustees' bias is not eliminated or even much attenuated by the fact that the trustees lack discretion to apply different actuarial methods to different withdrawing employers.[18] The remaining question is whether the availability of arbitration ensures the requisite due process to withdrawing employers.
 
 3. Arbitration
 
 75
 While some of the cases holding that particular panels were unconstitutionally biased involved situations where judicial review was available, none involved the extra layer of arbitral review that MPPAA requires. On one occasion we squarely considered the question whether an extra layer of review sufficed to provide a fair hearing despite an initially biased tribunal. In that case, Goodman v. Laborers' Int'l Union of NA, 742 F.2d 780 (3d Cir.1984), we expressed uncertainty as to whether de novo review rescues a tainted hearing, but found that where the tainted decision was reviewed under a deferential standard (under which it was to be affirmed if "amply supported by the evidence,") the subsequent hearing did not cure the defect. Id. at 785.[19] We see no reason to depart from the ratio decidendi of Goodman: that where an initial hearing is tainted by bias, arbitration cannot provide the requisite fair hearing if the arbitration proceeding is not de novo.[20] Neither the appearance nor reality of fairness is served when a tainted verdict is presumed correct in subsequent review.
 
 
 76
 We do not deny the Keith Fulton court's view that the presumptions are rational means of promoting uniformity and discouraging litigation. For this reason, they survive a substantive due process analysis and a Mathews test. Similarly, the replacement of contingent withdrawal liability with mandatory liability and the repeal of the 30% maximum, see supra note 1, though harsh, are within Congress' power. As Judge Coffin explained, these provisions were rational responses to a serious problem. As we have noted, however, while a substantive due process analysis and a Mathews test permit the balancing of fairness and efficiency, the right to an impartial decisionmaker permits no such balancing. Regardless of the importance of ensuring the solvency of pension plans, and the reasonable relation between that end and the statutory scheme, one requirement can be clearly deduced from basic principles of judicial fairness and from Supreme Court jurisprudence: the assessment of liability must be made by an unbiased party. In sum, because the trustees are biased and have significant discretion, and because their determination of liability is deferentially reviewed in arbitration and in district court, we believe MPPAA deprives employers of their constitutional right to a fair hearing.
 
 VI. SEVERABILITY
 As the Supreme Court recently stated:
 
 77
 A ruling of unconstitutionality frustrates the intent of the elected representatives of the people. Therefore, a court should refrain from invalidating more of the statute than is necessary.
 
 
 78
 Regan v. Time, Inc., 468 U.S. 641, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984). We are, therefore, obliged to consider whether the unconstitutional aspect[s] of MPPAA can be severed from the remaining statutory scheme to leave the fundamentals of the scheme intact. There are three aspects of MPPAA, which, in concert, deprive withdrawing employers of an impartial decisionmaker: the initial determination of liability by biased trustees; the deference the arbitrator must grant to the trustees' determination; and the deference the district court must grant to the arbitrator's determination. If severing only one of these provisions from the scheme will save the constitutionality of MPPAA, we are obliged by principles of statutory construction and the separation-of-powers concerns that underlie them to strike down only that provision. Id. These principles further require that we sever that provision which is least central to Congress' scheme. In the interests of economy, rather than determining the severability of each of these provisions, we shall make a preliminary determination as to which section is least central to the scheme and then examine whether that section is severable.
 
 
 79
 The provision that the district court defer to the arbitrator's factual findings is commonplace in the context of judicial review of arbitration and represents a considered decision by Congress that district courts not be authorized to second-guess arbitrators' decisions. See supra note 9. Should our decision result in de novo review of the arbitrator's decision in district court, MPPAA would be rendered different from most arbitral schemes in apparent defiance of Congress' clear intent.
 
 
 80
 The provision placing the initial determination in the hands of the trustees represents, in part, Congress' effort to capitalize on the expertise of persons experienced in and devoted to the pension fund process. Striking down only that provision would require deciding who should replace the trustees in making the initial assessment of liability--a matter not appropriate for judicial determination.
 
 
 81
 We conclude that the least intrusive means of adjusting MPPAA to preserve its constitutionality is to eliminate Sec. 1401(a)(3)(A)'s stipulation that the arbitrator accord a presumption of correctness to the trustees' determination of liability. We must now determine whether Sec. 1401(a)(3)(A) is properly severable from MPPAA under the Supreme Court's standards governing severability and whether severing this section does, in fact, save the constitutionality of the scheme.
 
 
 82
 A. Is Sec. 1401(a)(3)(A) Severable From MPPAA?
 
 
 83
 The Supreme Court has set forth the following test of severability:
 
 
 84
 Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.
 
 
 85
 Buckley v. Valeo, 424 U.S. 1, 108-09, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976), quoting Champlin Refining Co. v. Corporation Commission of Oklahoma, 286 U.S. 210, 234, 52 S.Ct 559, 564, 76 L.Ed. 1062 (1932). Under this standard, "the presumption is in favor of severability." Regan, 104 S.Ct. at 3269. There is no question that MPPAA would remain fully operative as a coherent statutory scheme if the trustees' determination of withdrawal liability were not presumed correct in arbitration.[21] The remaining question, then, is whether Congress would have passed MPPAA without the presumption in favor of the trustees' determination. For several reasons, we believe it would have.
 
 
 86
 First, MPPAA amended ERISA, which contains a severability clause, Section 1139 stipulates that if any provision of ERISA is deemed unconstitutional, the remainder of the Act is to remain intact. Section 1139 was not repealed or amended by MPPAA. Thus, it was clearly Congress' intent that provisions of the complicated scheme were to be severable.[22] MPPAA contains many provisions that serve Congress' aim of discouraging plan withdrawals and ensuring plan solvency, e.g., repeal of the 30% maximum liability, and provisions for mandatory withdrawal liability. The legislative history offers no suggestion, and we have no reason to believe, that Congress would not have passed MPPAA simply because it could not insulate the trustees' initial determination of liability from de novo review.
 
 
 87
 Accordingly, we find Sec. 1401(a)(3)(A) to be severable from the rest of the statutory scheme.
 
 
 88
 B. Does The Severing of Sec. 1401(a)(3)(A) Rescue The Scheme's Constitutionality?
 
 
 89
 We believe that the arbitrator's exercise of de novo review over the trustees' determination would suffice to meet the requirement of an impartial decisionmaker. The Ninth and Second Circuits have already held that a fair de novo hearing removes the taint of an earlier biased tribunal. Perry v. Milk Drivers' & Dairy Employees Union Local 302, 656 F.2d 536, 539 (9th Cir.1981); Rosario v. Ladies Garment Cutters' Local 10, 605 F.2d 1228, 1244-45 (2d Cir.1979). It seems clear that a full and fair de novo hearing before an arbitrator offers the withdrawing employer a fair disposition of his case and satisfies the appearance of justice.[23]
 
 
 90
 The trustees' determination is the first in a scheme that requires arbitration and judicial review. We are satisfied that if the arbitrator does not accord the trustees' determination a presumption of correctness, MPPAA will meet the constitutional requirement of providing an impartial decisionmaker.[24]
 
 
 91
 Thus, we will strike down only the requirement that the trustees' determination be presumed correct in arbitration, leaving the rest of MPPAA fully operative.
 
 VII. CONCLUSION
 
 92
 We will affirm the district court's grant of summary judgment for the Plan and its dismissal of Yahn's counterclaim. We will vacate the district court's denial of attorney's fees, costs and liquidated damages to the Plan. We hold that, contrary to the decision of the district court, MPPAA denies withdrawing employers their constitutional right to procedural due process. We find the statutory scheme constitutional after severing only the provision of MPPAA that accords the trustees' determination of withdrawal liability a presumption of correctness. We will remand this case for proceedings consistent with this opinion.
 
 
 93
 Our constitutional holding does not affect our other holdings with respect to Yahn's liability for withdrawal payments and for attorney's fees, liquidated damages and costs. Because we have found the statutory scheme constitutional once the arbitrator's deference to the trustees' determination is severed, the unconstitutional aspect of MPPAA has not affected Yahn: Yahn's case has yet to go to arbitration. The extent of Yahn's liability will now be determined in arbitration with no presumption in favor of the trustees' assessment. In the interim, Yahn must make a withdrawal liability payment because that is required by the statutory scheme (which, except for the presumption in arbitration, we have upheld). Yahn must also pay the Plan's attorney's fees, costs and liquidated damages because such fees and costs are mandatory upon a judgment for delinquent payments in favor of a pension plan, and we have affirmed the district court's judgment in favor of the Plan with respect to Yahn's delinquent payments. In calculating attorney's fees, the district court may reduce the award to take into account the fact that some of the Plan's attorney's fees were expended in defense against Yahn's successful constitutional challenge. See Hensley v. Eckerhart, 461 U.S. 424, 436-37, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983).
 
 
 94
 SEITZ, Circuit Judge, dissenting in part.
 
 
 95
 I disagree with the majority's important conclusion in Part V that the presumption of correctness accorded the plan trustees' determination of withdrawal liability in arbitration proceedings under 29 U.S.C. Sec. 1401(1)(a)(3)(A) violates due process. The majority's decision, in my view, does unwarranted violence to Congressional intent and is an open invitation to proliferated and expanded arbitration proceedings. Because of my position, I need not reach the question of severability discussed in Part VI of the majority opinion.
 
 
 96
 The majority opinion fails to differentiate among the types of decisions the plan sponsors are called upon to make. First, the majority's doctrinal approach is inapplicable to the choice of method for calculating withdrawal liability, see 29 U.S.C. Sec. 1391, a choice that merely involves the selection of generally applicable rules of plan governance. Second, with respect to actuarial assumptions used by plan sponsors, the majority overstates the amount of discretion sponsors enjoy. What limited discretion they do have, coupled with the availability of arbitration and judicial review, is in my view well within the constitutional power of Congress to grant. Finally, although the majority mentions the sponsors' responsibility to determine the applicability of a statutory exemption, I consider that a separate issue and would not reach it in this case.
 
 
 97
 The majority's most serious error is to misread the nature of the trustees' power to choose the actuarial method for calculating the withdrawing employer's share of unfunded vested liabilities. 29 U.S.C. Sec. 1391. The majority treats this decision as one to be made only when the first employer withdraws. As I read the statute, however, this is not an adjudicative function at all, but rather a matter of establishing general rules for the plan's administration prior to any withdrawals. Unless the plan is amended pursuant to 29 U.S.C. Sec. 1391(c), the trustees are required to employ the presumptive method described in Sec. 1391(b). Any amendment must apply uniformly to all withdrawing employers. Id. Sec. 1394(b). The majority recognizes this uniformity requirement, but fails to appreciate the significance of section 1394(a), which specifies that "[n]o plan rule or amendment ... under section ... 1391(c) of this title may be applied without the employer's consent with respect to liability for a withdrawal ... which occurred before the date on which the rule or amendment was adopted."[1] Thus, when Yahn withdrew from the pension plan, the trustees simply had no choice about which method to employ: either the method specified by amendment, or--if the plan was never amended--the presumptive method.
 
 
 98
 I do not think that the trustees are disabled by their position from performing this sort of legislative, as opposed to adjudicative, function. The Supreme Court has stated that "due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities." Schweiker v. McClure, 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982) (emphasis added). And the cases cited by the majority involved persons in judicial roles. I find it difficult to understand the majority's apparent conclusion that fiduciaries of the pension fund should be held incompetent to establish general plan rules for calculating withdrawal liability.
 
 
 99
 The trustees' choice of actuarial assumptions (including interest rates, mortality rates, turnover rates, and the like) presents a somewhat different problem, since admittedly some if not all of these assumptions will tend to vary with time. However, whatever discretion the trustees may have in this regard does not seem to me to create constitutional difficulties.
 
 
 100
 It is worth noting initially that the fiduciary duty of the trustees to the fund beneficiaries does not entail a duty to assess the largest reasonable liability against a withdrawing employer. Under the Act, trustees must employ either actuarial assumptions promulgated by the PBGC, or assumptions "which, in the aggregate, are reasonable ... and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. Sec. 1393 (emphasis added). There is nothing in the Act to suggest that trustees are expected to select actuarial assumptions with an eye to maximizing withdrawal liability, rather than those that will best reflect the plan's experience.[2]
 
 
 101
 Moreover, the trustees' discretion to make actuarial assumptions is far more limited than the majority suggests. First, the statutory language makes clear that an actuary must be employed in setting actuarial assumptions. Indeed, the requirement that the assumptions reflect "the actuary's best estimate of anticipated experience under the plan" suggests that the trustees are not generally free to reject the actuary's estimates. This interpretation is buttressed by the legislative history of 29 U.S.C. Sec. 1082(c)(3), the ERISA section, enacted in 1974, concerning actuarial assumptions to be used in determining if minimum funding standards have been met. That section contains language identical to that in Sec. 1393 requiring assumptions that "in the aggregate, are reasonable," and that reflect the actuary's "best estimate" of anticipated plan experience.
 
 
 102
 The legislative history of section 1082 indicates Congress' belief that such assumptions must be "independently determined by an actuary," and that "it is inappropriate for an employer to substitute his judgment for that of a qualified actuary" with respect to them. S.Rep. No. 383, 93rd Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 4639, 4890, 4954. Thus, withdrawal liability calculated on the basis of actuarial assumptions at odds with those recommended by the plan actuary could very well be considered presumptively unreasonable.[3]
 
 
 103
 I also read the statute to require the trustees, as far as possible, to use the same actuarial assumptions for calculating withdrawal liability that they use for all other purposes.[4] Both sections 1082(c)(3) and 1393 of title 29 require, in identical words, the use of "actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." See also H.R.Conf.Rep. No. 1280, 93rd Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 5038, 5065 ("The conferees intend that under this provision [section 1082(c)(3) ] a single set of actuarial assumptions will be required for all purposes (e.g., for the minimum funding standards, reporting to the Department of Labor and to participants and beneficiaries, financial reporting to stockholders, etc.)"; emphasis added). Although section 1082 was enacted in 1974, prior to MPPAA, I cannot believe that Congress could have intended to permit the trustees to use different assumptions under section 1393 when it used precisely the same words as those in the earlier section. Using different assumptions could very well be attacked as presumptively unreasonable both in arbitration and on judicial review.
 
 
 104
 My view that the trustees are required to act in a reasonably consistent manner greatly limits their discretion, because the use of assumptions overly favorable to the fund in one context will tend to have offsetting unfavorable consequences in other contexts. For example, the use of assumptions (such as low interest rates) that would tend to increase the fund's unfunded vested liability for withdrawal liability purposes would also make it more difficult for the plan to meet the minimum funding requirements of Sec. 1082. My reading of the cases cited by the majority does not convince me that whatever residual discretion the trustees enjoy is inconsistent with due process.
 
 
 105
 Finally, the majority relies on the fact that the trustees are responsible in the first instance for determining whether a withdrawing employer falls within a statutory exemption to liability. Maj. op., at 140. Since there is no challenge in this case on that ground, and since the precise scope of arbitral and judicial review in this area is far from clear,[5] I would leave for another day the question whether the trustees' decision with respect to a statutory exemption is entitled to a presumption of correctness, on either factual or legal grounds.
 
 
 106
 The majority's concerns for fairness to the employer are not entirely unwarranted, but the result it reaches--erasing from the statute the presumption of correctness accorded the trustees' determination of liability in arbitration proceedings--promises to frustrate severely the congressional enforcement scheme. Without the presumption the plan may well, as Congress feared, "be helpless to resist dilatory tactics by a withdrawing employer--tactics that could, and could be intended to, result in prohibitive collection costs to the plan." Sen.Comm. on Labor and Human Resources, 96th Cong., 2d Sess., Sec. 1076, The Multiemployer Pension Plan Amendments Act of 1980: Summary and Analysis of Consideration 21 (1980), quoted in Keith Fulton, 762 F.2d at 1143 n. 7.
 
 
 107
 Accordingly, I dissent from the judgment of the majority as to Parts V and VI.
 
 
 
 [1]
 The combination of the repeal of the 30% maximum liability, the mandatory nature of liability, and the retroactive application of the scheme has been conceded, even by courts which have upheld the constitutionality of MPPAA, to impose a great hardship on withdrawing employers. See, e.g., Keith Fulton & Sons, Inc. v. New England Teamsters and Trucking Industry Pension Fund, Inc., 762 F.2d 1137 (1st Cir.1985) (en banc). In his dissent in Keith Fulton, Judge Aldrich dramatically described the "stacked deck" which MPPAA dealt withdrawing employers:
 "[H]e finds himself, without possibility of relief, in a boxing ring from which he had been told he might be exempt, the prize being his own money, in an uneven match, but assured by the referee that he would see to it that it was a fair fight. Although not put in exactly those terms, the justification offered for this is that it was his own fault for associating with people like that, and his opponent needs the money."
 Id. at 1146.
 
 
 [2]
 Section 1301(b) makes companies under common control jointly and severally liable for one another's debts. Yahn's parent company Pennstar is also an appellant. All references herein to "Yahn" refer to both Yahn and Pennstar
 
 
 [3]
 In addition to disagreeing with the district court's legal determinations about withdrawal liability, Yahn argues that the grant of summary judgment was inappropriate in the face of allegedly disputed factual matters. We find this claim without merit
 Yahn argued in the district court that its parent company and co-appellant Pennstar was not directly notified about its liability, and therefore cannot be liable for withdrawal liability payments. Yahn contends on appeal that summary judgment should not have been granted in light of the factual dispute concerning the adequacy of the notice given Pennstar. However, the demand letter sent to Yahn's attorney, who is also Pennstar's attorney, specifically warned that the Plan reserved the right to look to a parent company for payment. Moreover, Yahn and Pennstar have the same President. Indeed, Yahn does not assert that Pennstar lacked knowledge about the determination of its liability. There is no question of fact as to what notice Pennstar received, only the question of law as to the adequacy of such notice under Sec. 1399. The PBGC has stated that notice of one company suffices as notice to a commonly controlled company. 49 Fed.Reg. 22,644 (1984). We agree. Thus the dispute concerning notice did not afford a basis for the district court not to grant summary judgment.
 Yahn also claims that there was a material factual dispute concerning whether the plan gave Yahn's requested review "reasonable" consideration as required by Sec. 1399(c)(2), and that, in the wake of this factual dispute, summary judgment was inappropriate. While there was an issue of fact as to the adequacy of the Plan's review, it was not material to the issue before the district court concerning Yahn's obligation to make withdrawal liability payments pending arbitration. The adequacy of the Plan's review is a question appropriate for arbitration. Under our holding in Part III, however, Yahn was obligated to make withdrawal liability payments pending arbitration. See infra pp. 132-135.
 We also find without merit Yahn's argument that the district court improperly dismissed its counterclaim.
 
 
 [4]
 The appeals, timely filed, are before us under 28 U.S.C. Sec. 1291
 
 
 [5]
 Additionally, the reference in Sec. 1399(c) to overpayments and underpayments would seem gratuitous if no payments had to be made until after arbitration
 
 
 [6]
 Yahn also cites regulation 29 C.F.R. Sec. 2644.2(c)(1) (1985), which provides that "a default as the result of failure to make any payments shall not occur until the 61st day after ... the issuance of the arbitrator's decision." The Plan argues persuasively, however, that the default referred to is only a "default which triggers the acceleration of the total amount of outstanding liability." (Appellee's brief at 17). Indeed, in Sec. 1399(c)(5), a "default" justifies a demand for immediate total payment. In its supplementary comments to the regulations, the PBGC defines default in a manner entirely consistent with the Plan's interpretation of the regulation. 49 Fed.Reg. 22,643 (1984). Moreover, Yahn's reading of 29 C.F.R. Sec. 2644.2(c)(1) is implausible given Section 2644.2(c)(3), which discusses the post-arbitration refund of "overpayments." It is difficult to see how overpayments would ever occur if employers did not have to make any payments pending arbitration
 
 
 [7]
 To this end, we will send a copy of this opinion, with a cover letter calling attention to this point, to the Solicitor of the United States Department of Labor and the ranking majority and minority members on the House and Senate Labor Committees
 
 
 [8]
 We disagree with the Plan's contention that this court had already decided this issue in Teamsters Pension Trust Fund of Philadelphia and Vicinity v. John Tinney Delivery Service, 732 F.2d 319 (3d Cir.1984). In Tinney we held that the district court mistakenly ignored the remedies made available by Sec. 1145, but we did not decide whether those remedies were mandatory
 
 
 [9]
 Most statutory schemes providing for arbitration require reviewing courts to defer to arbitrator's findings, and this is not in itself problematic. In MPPAA, however, this practice is said to perpetuate the insulation of the trustees' putatively biased determination from effective review. We note that Sec. 1401(c) requires the district court to presume the arbitrator's findings of fact correct, and makes no mention of the scope of review of the arbitrator's legal determinations. In light of this court's settled policy of extreme deference to an arbitrator's legal as well as factual determinations, see, e.g., United Steelworkers of America, District 36 v. Adbill Management Corp., 754 F.2d 138 (3d Cir.1985), we do not read this omission as suggesting that the district court has plenary review over the arbitrator's findings of law. In any event, the trustees' factual determinations and discretionary judgments, which must indisputably be reviewed deferentially in both arbitration and the district court, are critical to assessments of withdrawal liability
 
 
 [10]
 In Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), the Supreme Court upheld the constitutionality of retroactive application of the statute and in Connolly v. Pension Benefit Guaranty Corporation, --- U.S. ----, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986), the Court determined that MPPAA does not violate the takings clause. In Terson Company, Inc. v. Bakery Drivers and Salesman Local 194, 739 F.2d 118 (3d Cir.1984), this court upheld MPPAA against the contentions that it violated substantive due process and the right to trial by jury and that it was unconstitutionally vague
 
 
 [11]
 The First Circuit case was decided en banc, after a panel in the First Circuit had held MPPAA unconstitutional. The vacated panel decision was also published in the bound federal reporter (at 762 F.2d 1124 (1st Cir.1984))
 
 
 [12]
 The majority opinion was joined by Chief Judge Campbell, Judge Bownes and Judge Breyer. Judge Torruella joined the dissent
 
 
 [13]
 Significantly, in McClure the plaintiff alleged both that the procedures were generally insufficient and that there was a biased decisionmaker. The Court applied the Mathews test to the question of sufficiency of procedures, but conspicuously avoided using the test to determine whether plaintiff's right to an impartial hearing was violated
 
 
 [14]
 In his dissent in Keith Fulton, Judge Aldrich made the point that the trustees selected by contributing employers would also be biased against withdrawing employers because of their allegiance to their personal employer: they would seek to maximize the Plan funds so as to increase the plan's solvency and protect their personal employer from greater liability in the event of a future withdrawal. 762 F.2d at 1148. Judge Coffin rejoined that, if the employer-selected trustees were anticipating their personal employer's withdrawal, they would avoid an excessive assessment against other withdrawing employers for fear of establishing a precedent that would adversely affect their own employer when it withdrew. We do not choose between the majority's and Judge Aldrich's accounts of the likely strategy of the trustees appointed by the employers. These speculations are too remote to be dispositive, especially in light of the clear duty all trustees owe the fund. See infra at p. 139
 
 
 [15]
 This is especially true because an impartial hearing preserves the appearance of fairness as well as guarding against bad outcomes. See Marshall v. Jerrico, 446 U.S. 238, 243, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182 (1980)
 
 
 [16]
 McClure involved the administration of Part B of the Medicare program under the Social Security Act, which provides federally subsidized insurance for certain medical costs. The Secretary of Human Services is authorized to contract with private insurance carriers to administer the payment of Part B claims. Carriers often hire private hearing examiners to determine claimants' eligibility under Part B. Plaintiff alleged that, as the hearing officers were appointed by the Insurer, they would be biased against claimants. The Court found that as payments to claimants were made by the federal government, not the carrier, and as the hearing examiner was paid by the government, not the carrier, there was no disqualifying conflict of interest
 
 
 [17]
 Under Sec. 1384, withdrawing employers are exempt from liability payments if their withdrawal results from a bona fide arm's length sale of assets to another company that assumes its contractual obligations
 
 
 [18]
 We must also reject the suggestion, advanced tangentially by the majority in Keith Fulton, that the trustees' role is not adjudicative in nature. The trustees perform the judicial task of making case-by-case determinations significantly affecting the property of employers. In holding in Jerrico, supra, that the Assistant Regional Administrator's function was prosecutorial rather than judicial, the Court noted that he "rules on no disputed factual or legal questions." 446 U.S. at 247, 100 S.Ct. at 1615. As noted, the trustees must frequently make complex legal and factual determinations
 
 
 [19]
 Goodman involved a union member charged in a union disciplinary proceeding. Although plaintiff asserted his right to impartial hearing as derived from statute, not from the Constitution, the principle is the same
 
 
 [20]
 The one case in which this circuit seemed to tolerate a degree of acknowledged bias, First Jersey Securities, Inc. v. Bergen, 605 F.2d 690 (3d Cir.1979), involved a self-regulatory scheme of the securities industry, over which SEC had de novo review
 
 
 [21]
 The initial Keith Fulton panel, whose decision was vacated on other grounds, reached this same conclusion. 762 F.2d at 1134 (1st Cir.1984)
 
 
 [22]
 The existence of a "savings clause" does not end the severability inquiry, but is powerful evidence of Congress' intent. See Immigration & Naturalization Service v. Chadha, 462 U.S. 919, 932, 103 S.Ct. 2764, 2774, 77 L.Ed.2d 317 (1983)
 
 
 [23]
 This conclusion is not undermined by the Supreme Court's discussion in Ward, supra:
 Nor, in any event, may the State's trial court procedure be deemed constitutionally acceptable simply because the state eventually offers a defendant an impartial adjudication. Petitioner is entitled to a neutral and detached judge in the first instance.
 409 U.S. 57 at 61-62, 93 S.Ct. at 83-84. We note that the Court referred to a neutral judge. While the trustees' role is judicial in character, it does not pose the same problem, with respect to purity of the judicial system, as does a biased judge sitting in a courtroom and determining guilt or innocence, or liability vel non. Indeed, this limiting interpretation of the above passage in Ward has already been adopted by this court. Pennsylvania v. United States of America, 781 F.2d 334, 337 (3d Cir.1986) ("Ward, however, involved a criminal proceeding ... [T]he present matter [is] strictly administrative ...."). Accord Wolkenstein v. Reville, 694 F.2d 35, 44 (2d Cir.1982) ("But we are by no means sure that this ruling [Ward ], made in a criminal case, applies to the decision of a school administrator ...."; E.E.O.C. v. Sears, Roebuck & Co., 504 F.Supp. 241, 252 n. 21 (N.D.Ill.1980) (Ward holding that de novo trial does not cure earlier tainted hearing is limited to adjudicative setting).
 
 
 [24]
 We note that Judge Aldrich, despite his serious objections to the MPPAA procedures, concluded that the elimination of the presumption in favor of the trustees' determination would cure MPPAA's constitutional deficiencies. 762 F.2d at 1144
 Additionally, we note that MPPAA without the presumption in favor of the trustees' determination passes a Mathews test. (Although, as we have explained, a Mathews test is inappropriate to resolve allegations of a biased decisionmaker, Yahn has also questioned the adequacy of the procedural safeguards afforded by MPPAA generally.) The district court found that MPPAA passed a Mathews test for several reasons. First, it found that the state interest in protecting the vitality of pension funds is quite substantial. The legislative history of MPPAA reveals that Congress was extremely concerned about the solvency of pension plans which had been greatly threatened by employer withdrawals. Second, the district court found that the likelihood of erroneous deprivation was minimized by two layers of review--arbitration and judicial review by a district court. Finally, if a finding of overpayments is made, the excessive amounts are refunded with interest to the employer; thus the individual interest affected, while not minimal, is not overwhelming. Under the circumstances, the district court found that MPPAA, even with the presumption in favor of the trustees' determination, survived the Mathews test. We need not determine whether that holding was correct, because given the de novo review by an arbitrator that our decision today requires, there is little question that MPPAA provides sufficient procedural safeguards to pass a Mathews test.
 
 
 [1]
 The accompanying House Committee report explains:
 In order to protect an employer from retroactive changes in a plan's withdrawal liability rules the bill would restrict the application of plan rules or amendments relating to an employer's withdrawal liability with respect to a withdrawal occurring before its date of adoption, unless the employer in question consents to its retroactive application.
 H.R.Rep. (Educ. and Lab.Comm.) No. 869--Part I, 96th Cong., 2d Sess. 85, reprinted in 1980 U.S.Code Cong. & Ad.News 2918, 2953. See also H.R.Rep. (Ways and Means Comm.) No. 869--Part II, 96th Cong., 2d Sess. 30, reprinted in 1980 U.S.Code Cong. & Ad.News 2992, 3019 (same).
 
 
 [2]
 The majority relies on legislative history to support its view that "Congress expected the trustees to exercise wide discretion." Maj. op., typescript at 30 (citing H.R.Rep. No. 869--Part I, 1980 U.S.Code Cong. & Ad.News at 2935). But the majority's undifferentiated view of the discretion exercised by the trustees leads it to misread the passage it quotes. Read in context, the passage clearly refers to the trustees' discretion to adopt plan rules, such as the method for calculating withdrawal liability and for determining whether the so-called de minimis exemption, 29 U.S.C. Sec. 1389, applies. As noted, however, such plan rules and amendments must operate uniformly as to all employers and may not operate retroactively, id. Sec. 1384. Thus, the majority's due process analysis is therefore inapt. The passage does not suggest that the trustees' case-by-case determinations of withdrawal liability--to which that analysis would properly apply--are subject to similarly wide discretion
 
 
 [3]
 The First Circuit has cited one case in which the trustees rejected the actuary's assumptions and the arbitrator found the trustees' assumptions unreasonable. Keith Fulton & Sons, Inc. v. New England Teamsters and Trucking Indus. Pension Fund, 762 F.2d 1137, 1141 n. 3 (1st Cir.1985) (in banc) (citing Woodward Sand Co. and Operating Engineers' Pension Trust, 3 E.B.C. (BNA) 2351 (1982) (Kaufman, Arb.))
 
 
 [4]
 Title 29 U.S.C. Sec. 1023 requires an annual filing with the Secretary of Labor, including, inter alia, a statement of actuarial assumptions used by the plan. Id. Sec. 1023(d)(6). The report must be prepared and signed by a qualified actuary. See also 26 U.S.C. Sec. 412(c) (requiring similar determinations for income tax purposes). The actuarial assumptions are used to determine whether minimum funding standards, a key requirement of ERISA, have been met
 
 
 [5]
 I am aware of no case discussing this issue. In Republic Industries v. Teamsters Joint Council, 718 F.2d 628, 641 (4th Cir.1983), cert. denied, 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984), the court indicated that the arbitrator's legal rulings are subject to judicial review, but did not discuss the scope of that review or the degree of deference commanded by the arbitrator