**UNITED FOOD AND COMMERCIAL WORKERS UNION, Plaintiff,**

**v.**

**PROGRESSIVE SUPERMARKETS, Defendant.**

**AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA, Plaintiff,**

**v.**

**PROGRESSIVE SUPERMARKETS, Defendant.**

**Civ. A. Nos. 84–4114, 86–2095.**

United States District Court, D. New Jersey.

Sept. 2, 1986.

As Amended Sept. 16, 1986.

**634**

Bressler, Director & Ross by Lawrence D. Ross, Morristown, N.J., and Kleinbard, Bell & Brecker by Fred D. Furman, Philadelphia, Pa., for Amalgamated Meat Cutters.

Grotta, Glassman & Hoffman, by Stephen S. Mayer, Roseland, N.J., for defendant.

Tomar, Parks, Seliger, Simonoff & Adourian by Howard Simonoff, Haddonfield, N.J., and Morgan, Lewis & Bockius by Steven D. Spencer, Philadelphia, Pa., for United Food and Commercial Workers Union.

## OPINION

STERN, District Judge.

This matter comes before the Court on motions for summary judgment brought by plaintiffs in each case, and on a motion for partial summary judgment brought by defendants in the *United Food* case. After oral argument on June 9, 1986, this Court reserved decision. For the reasons stated below, plaintiffs' motions will be granted and defendants' will be denied.

FACTS

Defendant Progressive Supermarkets ("Progressive") decided on or about July 22, 1983 to liquidate all of its assets. Progressive's Board of Directors adopted a resolution authorizing the sale of all the stores. Progressive proceeded to cease operations and to withdraw from plaintiff pension funds in October 1983. Pursuant to ERISA, 29 U.S.C. § 1391(b) (1985), the Fund Administrator of the Participating Employers Tri-state Pension Fund assessed withdrawal liability against Progressive in the amount of $370,186.28. The Fund Administrator also set forth a schedule of payments pursuant to ERISA guidelines with the first payment due March 1, 1984.

Progressive made only one payment for $6,846.42 in May of 1984.

Progressive proceeded to request, pursuant to 29 U.S.C. § 1396(a)(1) (1985), that the Fund recompute the withdrawal liability because of various alleged errors. Meanwhile, Progressive went into liquidation on July 17, 1984 and requested arbitration of the dispute over the withdrawal liability calculation on Nov. 2, 1984. No arbitration has taken place because counsel for both sides agreed to a stay pending the outcome of the present litigation.

On October 2, 1984, the United Food and Commercial Workers Union together with the Participating Employers Tri-state Pension Fund filed the present action seeking relief from Progressive's failure to make withdrawal liability payments including interest, attorney's fees, and costs, and an order directing Progressive to make payments promptly. Following discovery, plaintiffs requested and received permission to file an amended complaint naming new defendants which are allegedly part of a "group of trades or businesses under common control" within the meaning of § 414(c) of the Internal Revenue Code.

On September 24, 1985, the pension fund of the Amalgamated Meat Cutters and Butcher Workmen of North America notified Progressive of a withdrawal liability of $387,465. The Meat Cutters and its pension fund subsequently filed suit and received permission to join the present motion, relying entirely on the brief submitted by plaintiffs in the *United Food* case, as the motion raises issues common to both cases. Progressive now faces claims exceeding $750,000. It has deposited some $270,000 with the court, allegedly representing all of its remaining assets.

In the plaintiffs' motions before the court, they claim that Progressive should be making withdrawal liability payments pending arbitration and that Progressive

and a general partnership called B.E.G.M. Associates are a "single employer" within the meaning of ERISA, 29 U.S.C. §§ 1002(37)(B), 1301(b)(1) (1985). At the time of Progressive's liquidation in 1984, the ownership of Progressive and B.E.G.M. was divided as follows:

| | PS | BEGM |
|---|---|---|
| William Margulis | 33⅓% | 33⅓% |
| Edward Gold | 27/38% | 33⅓% |
| William Margulis as Trustee of Anna Margulis Trust[1] | 38.88% | — |
| William Margulis Trust[2] | — | 33⅓% |

The facts of B.E.G.M.'s existence and operation are not in dispute. It was founded in June, 1977 by defendants William Margulis, Edward Gold and William Margulis Trust. It has a bank account but no employees, and its sole asset at present is a parcel of land off Route 46 in Rockaway, New Jersey. Until about October 31, 1981, Progressive operated a supermarket at the Rockaway site, as well as at five other locations in New Jersey. Progressive's financial statements show that Progressive leased the Rockaway site from a "related party," paying only "minimum rentals" plus a contingent rental based on sales in excess of stipulated amounts. During this time when Progressive operated the supermarket on land leased from B.E.G.M., Progressive was a party to collective bargaining agreements with plaintiff unions covering the Rockaway store and made payments to plaintiff pension funds.

When Progressive decided to liquidate all its assets in July 1983, the Board of Directors also authorized the sale of the Rockaway store for $2 million. The store's assets and inventory were sold to Shop-Rite of Rockaway Associates Inc., which entered into an agreement on August 8, 1983, to lease the site from B.E.G.M. The agreement is a net lease in that it states that "the fixed rent shall be absolutely net to

---

**1.** William Margulis is the sole beneficiary of this trust during his lifetime. Upon his death, the trust is to be distributed to his then-living issue.

**2.** William Margulis and his issue are the sole beneficiaries of this trust during his lifetime. William Margulis has limited power of appointment to name the persons to receive trust assets upon his death, subject to the restriction that they be drawn from his issue.

landlord." B.E.G.M. is not obligated to maintain or repair the property or provide other services to the tenant. The tenant pays taxes and maintenance expenses.

Defendants' motion is based upon a claim that the Fund's assessment of withdrawal liability was grounded on a section of ERISA that violates the due process and taking clauses of the United States Constitution.

## DISCUSSION

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub.L. 96–364, 94 Stat. 1208 (1980) (codified as amended at 29 U.S.C. §§ 1381–1453 (1985)), added a new subtitle to ERISA that, among other things, discourages withdrawal from multi-employer pension plans by imposing mandatory liability on withdrawing employers and by repealing a prior cap on that liability of 30% of the employer's net worth. Regardless of whether the pension fund is solvent under the new law, the withdrawing employer is liable for all of its assets. Upon an employer's withdrawal, the plan's trustees determine the amount of liability, 29 U.S.C. § 1381, applying one of several actuarial methods set forth in § 1391. The law requires the plan to notify the employer of its withdrawal liability and allows the employer ninety days to seek review by the plan's trustees. 29 U.S.C. § 1399(b)(1), (b)(2)(A) (1985).

### Payments Pending Arbitration

The plaintiffs' first claim for relief was decided subsequent to the filing of these motions when the Third Circuit ruled that interim withdrawal liability payments must be made pending arbitration. *United Retail and Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.*, 787 F.2d 128, 134 (3d Cir.1986). The same decision interpreted 29 U.S.C. § 1132(g)(2) to make mandatory an award of reasonable attorney's fees, liquidated damages, and costs upon a judgment in favor of a pension plan that withdrawal liability payments should have been made pending arbitration. *Id.* at 134–35.

3. The full text of 29 U.S.C. § 1301(b)(1) is:

### Constitutional Claims

Defendants' challenge to the constitutionality of the MPPAA rests upon the Third Circuit's recent holding that MPPAA procedures for assessing withdrawal liability against employers violates their due process rights to a fair hearing. *United Retail and Wholesale Employees*, 787 F.2d at 141. The court held that pension fund trustees were given too much discretion in assessing liability, despite the requirement that they apply statutory actuarial tables and the availability of arbitration to settle disputes. *Id.* at 140–42. The court declined to strike down the whole MPPAA, however; it simply struck down the provision that an arbitrator must accord a presumption of correctness to the trustee's determination of liability. *Id.* at 142–44.

Since the present case has not yet gone to arbitration, there has been no unconstitutionality. Where a constitutional challenge is raised against the applicability of a law to a particular set of facts, rather than against the law itself, exhaustion of administrative remedies is required. *Dorn's Transportation, Inc. v. Teamster's Pension Trust Fund of Philadelphia and Vicinity*, 787 F.2d 897, 903 (3d Cir.1986); *Republic Industries, Inc. v. Central Pennsylvania Teamsters Pension Fund*, 693 F.2d 290, 295–96 (3d Cir.1982). Plaintiffs do not yet have a cause of action either for the due process claim or the taking clause claim.

### The B.E.G.M. issue

Plaintiffs want this court to find B.E.G.M. Associates and Progressive to be a "single employer" within the meaning of ERISA, 29 U.S.C. §§ 1002(37)(B), 1301(b)(1) (1985). Such a determination would make B.E.G.M. liable for the withdrawal liability of Progressive. The statute sets forth two requirements for a finding of "single employer" status: Progressive and B.E.G.M. must be found to be "trades or businesses" and they must be "under common control." [3]

An individual who owns the entire interest in an unincorporated trade or business is treated

### 1. *"Trade or Business"*

█ Defendants claim that B.E.G.M. is a passive investment instrument, not a "trade or business." Under ERISA the meaning of "trade or business" is the same as its meaning in § 414(c) of the Internal Revenue Code, 26 U.S.C. § 414(c) (1985), and the regulations issued thereunder. 29 C.F.R. § 2612.2 (1985). The regulations issued thereunder are in 26 C.F.R. §§ 11.-414(c)–1—11.414(c)(4) (1985). The ERISA statute defining trades or businesses under common control as a "single employer" adds that regulations implementing this provision "shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of Title 26." 29 U.S.C. § 1301(b)(1) (1985).

Confining attention to § 414(c) and the regulations promulgated thereunder simplifies the problem for this court. As the Seventh Circuit recently observed, the phrase "trade or business" appears 170 times, by one count, in sixty different sections of the code.[4] *Groetzinger v. C.I.R.*, 771 F.2d 269, 271 n. 4 (7th Cir.1985) (*citing* Saunders, "Trade or Business," Its meaning under the Internal Revenue Code, 1960 *S.Cal.Tax Inst.* 693); *see Steffens v. Commissioner*, 707 F.2d 478, 482 (11th Cir. 1983). "[T]he precise meaning or connotation of the term appears to vary," the court continued, "depending upon the provision in which it is used." *Groetzinger*, 771 F.2d at 271. The court proceeded to limit its attention strictly to two sections of the Code, §§ 62, 162, having to do with the deductibility of expenses incurred in carrying on a trade or business, which was the issue before the Court. *Id.*

Unfortunately, § 414(c) contains no definition of "trade or business." The regulations promulgated thereunder offer no help either, at least no help for solving the problem presented by the present case. The phrase "trade or business" has "not been defined by either the Code or the Treasury regulations, nor has any authoritative judicial definition of the terms evolved." *Groetzinger*, 771 F.2d at 271 (citing B. Bittker, 1 *Taxation of Incomes, Estates and Gifts* ¶ 20.1.2 (1981)).

Defendants' solution at this stage is to refer this court to other sections of the code and to tax law cases interpreting "trade or business" in sections of the Code other than § 414(c). *See* 26 U.S.C. § 163(d)(4)(A) (1985) ("For purposes of this subsection, property subject to a lease shall be treated as property held for investment, and not as property used in a trade or business," so long as lessor's business expense deductions total less than 15% of rental income or lessor is guaranteed a specific return or guaranteed against loss of income[5]); *Continental Trading Inc. v. Commissioner*, 265 F.2d 40, 43 (9th Cir. 1959) *cert. denied*, 361 U.S. 827, 80 S.Ct. 76, 4 L.Ed.2d 70 (1959) (interpreting § 231(a), (b), of 1939 Code (§§ 881, 882(a) of 1954 Code) to preclude consideration of "mere management of investments and the collection of rents, interest, and dividends" as "trade or business"); *Fackler v. Commissioner*, 133 F.2d 509, 511–12 (6th Cir. 1943) (interpreting "trade or business" in § 231 of 1939 Code (§ 167 of 1954 Code)); *Cleveland Trust Company v. Commis-*

---

as his own employer, and a partnership is treated as the employer of each partner who is an employee within the meaning of section 401(c)(1) of Title 26. For purposes of this subchapter, under regulations prescribed by the corporation, all employees of trades or business (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer. The regulations prescribed under the preceding sentence shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of Title 26.
29 U.S.C. § 1301(b)(1) (1985).

**4.** Plaintiffs represent to the court that a LEXIS search turned up 330 appearances of "trade or business" in the Internal Revenue Code.

**5.** In relying on § 163(d)(4)(A), defendants ignore the problem of whether these two conditions are met. They also ignore the first phrase of the subsection: "For purposes of this subsection. . . ."

*sioner*, 115 F.2d 481, 483 (6th Cir.1940) (interpreting "business" in § 801(a) of 1939 code (omitted in 1954 Code) and § 3797(a) of 1939 Code (§ 7701(a) of 1954 Code)), *cert. denied*, 312 U.S. 704, 61 S.Ct. 809, 85 L.Ed. 1137 (1941); *Grier v. United States*, 120 F.Supp. 395, 398 (D.C.Conn.1954) (interpreting "trade or business" in § 231 of 1939 Code (§ 167 of 1954 Code)).

But the weakness of these authorities is clear. ERISA itself authorizes attention only § 414(c) of the Internal Revenue Code and to regulations promulgated thereunder. 29 U.S.C. § 1301(b)(1) (1985); 29 C.F.R. § 2612.2 (1985); 26 C.F.R. §§ 11.-414(c)–1—11.414(c)(4) (1985). Nothing prevented Congress from authorizing attention to other sections and regulations had Congress wanted to do so. Since the meaning of "trade or business" varies somewhat from one Code section to another, *Groetzinger*, 771 F.2d at 271; *Steffens*, 707 F.2d at 482 a suggestion that courts should look anywhere in the Code for guidance is an invitation to massive confusion. Predictably, there is impressive authority for the proposition that leasing property may be a "trade or business" under the Code, not merely an investment, *Whipple v. Commissioner*, 373 U.S. 193, 204–05, 83 S.Ct. 1168, 1175, 10 L.Ed.2d 288 (1963) (interpreting "trade or business" in § 23(k)(4) of 1939 Code (§ 166 of 1954 Code)); *Alvary v. United States*, 302 F.2d 790, 796 (2d Cir. 1962) (interpreting "trade or business" in § 122(d)(5) of 1939 Code (§ 172 of 1954 Code)); *Commissioner v. State—Adams Corporation*, 283 F.2d 395, 399 (2d Cir. 1960) (holding that rental of a single piece of commercial property under a net lease was a "trade or business" for purpose of deciding if corporate tax liability existed).

In the absence of clear guidance from 26 U.S.C. § 414(c), or even from the Internal Revenue Code in general, the meaning of "trade or business" should be interpreted in light of the intentions of ERISA. *Pension Benefit Guaranty Corp. v. Center City Motors, Inc.*, 609 F.Supp. 409, 411–12 (S.D.Cal.1984) ("ERISA does not contain a definition of the term 'trade or business.' Therefore, the court must construe this term in light of the purpose of the statute."); *see United Steelworkers v. Harris & Sons Co.*, 706 F.2d 1289, 1298–99 (3d Cir.1983) (tax precepts governing "partial terminations" of pension plans are not dispositive of whether partial termination occurs for purposes of ERISA); *cf. United States v. Stauffer Chemical Co.*, 684 F.2d 1174, 1185 (6th Cir.1982) ("The same phrase used in different sections of a complex act does not necessarily carry the same meaning in each context."), *aff'd*, 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984).

The purpose of 29 U.S.C. § 1301(b)(1) is apparent from its own terms and even more obvious in the light of the legislative history:

> [The Committee on Ways and Means], by this provision, intends to make it clear that the coverage and antidiscrimination provisions cannot be avoided by operating through separate corporations instead of separate branches of one corporation.

H.R.Rep. No. 807, 93d Cong., 2d Sess., *reprinted in*, 1974 U.S.Code Cong. & Ad. News 4639, 4670, 4716. S.Rep. No. 383, 93d Cong., 2d Sess., *reprinted in*, 1974 U.S.Code Cong. & Ad.News 4890, 4928 (same sentence in report of Senate Committee on Finance); *Center City*, 609 F.Supp. at 412 (Congress "clearly intended to prevent a business from limiting its responsibilities under ERISA by the fractionalization of its business operations.") Such a provision was logically essential to the central purpose of ERISA "to prevent the 'great personal tragedy' suffered by employees whose vested benefits are not paid when pension plans are terminated." *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 374, 100 S.Ct. 1723, 1733, 64 L.Ed.2d 354 (1980).

Except for one difference, the *Center City* case is analogous to the present case. In *Center City*, the court held that a proprietorship which only leased property to a corporation under a net lease was a "trade or business" under 1301(b)(1) and Title IV of ERISA. 609 F.Supp. at 412–13. The

court rejected interpretations of "trade or business" in the Internal Revenue Code as not determinative of how the phrase is used in ERISA. *Id.* at 411. The court held that under ERISA, where a net lease exists between entities under common control, the fact that one of the entities bore nearly all the responsibilities under the lease did not insulate the other from being treated as a "trade or business" for purposes of § 1301(b)(1). *Id.* at 412. The court noted that one of the evident purposes of Congress in enacting § 1301(b)(1) was to ensure that "the realities of business organization" would prevail over "the formalities of corporate structure" in imposing liability under ERISA. *Id.* (*quoting Pension Benefit Guaranty Corporation v. Anthony Company*, 537 F.Supp. 1048, 1052 n. 6 (N.D.Ill.1982).

The difference between *Center City* and the present case is that here a net lease existed between entities under common control, Progressive and B.E.G.M., only until August 1983. As discussed above, B.E.G.M. leased its property to Progressive for operation of a supermarket and collected only "minimum rentals" plus a contingent rental based on sales in excess of stipulated amounts. Progressive's own financial statements referred to B.E.G.M. as "related party." However, in July, 1983, Progressive decided to sell all its stores. The assets and inventory of the Rockaway store were sold to third-party Shop-Rite of Rockaway Associates. On August 8, 1983, B.E.G.M. entered into a net lease with this third-party. In October, 1983, Progressive withdrew from plaintiff pension funds and stopped making payments.

The *Center City* court expressly offered "no opinion on how it would regard a net lease in which the lessee was not an entity under common control." 609 F.Supp. at 412. Nor does this court need to reach the question of B.E.G.M.'s liability if B.E.G.M. had only leased its property to a third party. In the circumstances of this case, however, there is no significant difference from the *Center City* case. B.E.G.M. and Progressive were a "single employer" under the rule of *Center City* to August,

1983. To allow such a "single employer" to insulate assets from ERISA liability during a liquidation of its assets by negotiating a net lease with a third party would thwart the evident purpose of § 1301(b)(1): "To prevent such fragmentation of business enterprise." *Id.* We conclude that B.E.G.M. was a "trade or business" within the meaning of § 1301(b)(1).

### 2. *"Common Control"*

In order for two entities to be considered a "single employer" under § 1301(b)(1), they must also be under "common control." To ascertain the meaning of "common control," the ERISA regulations refer us, as they do for "trade or business," to § 414(c) of the Internal Revenue Code and the regulations issued thereunder. 29 C.F.R. § 2612.2 (1985). The regulations contain the following definition:

(c) *Brother-sister group of trade or business under common control*—(1) *General.* The term "brother-sister group of trades or businesses under common control means two or more organization conducting trades or businesses if (i) the same five or fewer persons who are individuals, estates, or trusts own (directly and with the application of § 11.414(c)–4), singly or in combination, *a controlling interest* of each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization.

(2) Effective control defined. For purposes of this paragraph, persons are in "effective control" of an organization if —(i) In the case of an organization which is a corporation, such persons own stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote such corporation or more than 50 percent of the total value of shares of all classes of stock of such corporation; ... (iii) In the case of an organization which is a partnership, such persons own an aggregate

of more than 50 percent of the profits interest or capital interest of such partnership.

26 C.F.R. § 11.414(c)–2(c) (1986) (emphasis added).

■ There is no dispute that the "effective control" test of § 11.414(c)–2(c)(1)(ii) is met in this case. At the time of the withdrawals from plaintiff pension funds, William Margulis owned a 33⅓% interest in both Progressive and B.E.G.M. Defendants do not dispute that under the relevant regulations the interests held by the Anna Margulis Trust and William Margulis Trust must be attributed to William Margulis because he held a life estate in both trusts.[6] Either directly or by attribution, William Margulis owned 72.22% of Progressive and 66.67% of B.E.G.M. Edward Gold owned 27.78% of Progressive and 33.33% of B.E.G.M. Taking into account the ownership of Margulis and Gold only "to the extent such ownership is identical with respect to each such organization," § 11.414(c)–2(c)(ii), the total for Gold is 27.78% and for Margulis is 66.87%. The total for both is 94.45%. Since this is greater than 50%, there is no question that the "effective control" test is met.

Defendants claim, however, that the present case does not satisfy the "controlling interest" test of § 11.414(c)–2(c)(1)(i). The meaning of this phrase is defined as follows:

(A) In the case of an organization which is a corporation ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote of such corporation or at least 80 percent of the total value of shares of all classes of stock of such corporation;

.    .    .    .    .

(C) In the case of an organization which is a partnership, ownership of at least 80 percent of the profits interest or capital interest of such partnership;

26 C.F.R. § 11.414(c)–2(b)(2). For purposes of meeting this 80% standard, defendants contend that Edward Gold's interest in Progressive and B.E.G.M. should not be included. Defendants rely on the following exclusion of certain employee interests in determining control:

(3) *Employees.* An interest which is an interest in or stock of such organization owned (directly and with the application of § 11.414(c)–4) by an employee of such organization shall be excluded if such interest or stock is subject to conditions which run in favor of a common owner of such organization or in favor of such organization and which substantially restrict or limit the employee's right (or if the employee constructively owns such interest or stock, the direct or record owner's right) to dispose of such interest or stock.

26 C.F.R. § 11.414(c)–3(c)(3).

The following special rule applies to this subsection:

(ii) *Special rule.* For purposes of paragraph· (c)(3) of this section only, if a condition which restricts or limits an employee's right (or direct or record owner's right) to dispose of his or her interest or stock also applies to the interest or stock in such organization held by a common owner pursuant to a bona fide reciprocal purchase arrangement, such condi-

---

**6.** *See* 26 C.F.R. § 11.414(c)–4(b)(3). William Margulis' actuarial interest in the stock held in trust under the terms of the Anna Margulis Trust was approximately 83.874% or approximately 32.61% of the total issued and outstanding shares of Progressive at the time of the withdrawal. *See* 26 C.F.R. § 20.2031–7, Table A. Because William Margulis had a greater than 50% ownership interest in Progressive, the interests of his children are also attributed to him. *See* 26 C.F.R. § 11.414(c)–4(b)(6)(i) and (ii). Therefore, William Margulis' total interest in Progressive was 72.22% of the oustanding shares. William Margulis' actuarial interest in the capital and profits interest held in trust under the terms of the William Margulis Trust is approximately 83.874% or approximately 27.96% of the total available capital and profits interest of B.E.G.M. *See* 26 C.F.R. § 20.2031–7, Table A. Because William Margulis had a greater than 50% ownership interest in B.E.G.M. the attribution regulations require that the interests of his children also be attributed to him. Therefore William Margulis owned directly or constructively 66.67% of B.E.G.M.

tion shall not be treated as a substantial limitation or restriction.

26 C.F.R. § 11.414(c)–3(d)(6). Defendants claim that: (1) Gold is an "employee" of Progressive; (2) Gold held stock in Progressive that was subject to a substantial restriction on his right to dispose of the stock; and (3) the restriction was not reciprocal.

Plaintiffs contend that all the substantial restrictions on the right of Gold to dispose of his stock applied equally to Margulis. In other words, all were reciprocal. The shareholders of Progressive entered into two agreements in 1963–64 that restricted the rights of all shareholders to transfer stock to non-parties to the agreements. Notably, Progressive itself was given the rights of first refusal of and offer to sell stock by any shareholder. However, one paragraph of the 1963 agreement allowed members of the Margulis family (William, Anna and Morris) to transfer Progressive stock among themselves during their lifetimes and through their testamentary estates. No such intra-family transfer clause applied to Gold. The 1964 agreement somewhat altered the situation. Paragraph 3 of that agreement provided that "notwithstanding any former agreements" Gold had the right to pass his stock by will or intestacy to his widow, children or grandchildren. Paragraph 4 gave to the corporation, Progressive, the obligation to purchase any decedent shareholder's shares, and gave to any decedent's estate the right, but not the obligation to offer such shares to the corporation. Paragraph 5 barred Margulis family shareholders and Gold from buying shares from another shareholder. The corporation had to purchase such shares.

Therefore, the only nonreciprocal restriction on Gold's right to dispose of his stock was that Margulis family shareholders were permitted to transfer shares to other family shareholders during their lifetimes before offering the stock to Progressive. While no such provision applied to Gold. ■ This one element of nonreciprocity in otherwise perfectly reciprocal agreements is simply not a "substantial" restriction on Gold's right to dispose of his stock within the meaning of 26 C.F.R. § 11.-414(c)–3(c)(3). Under the special rule of § 11.414(c)–3(d)(6)(ii) a bona fide reciprocal purchase arrangement is not a substantial limitation or restriction. We find that the shareholders of Progressive had a bona fide reciprocal purchase arrangement. Accordingly, Gold's shares should be considered for purposes of the "controlling interest" test, and that test is met because Gold and Margulis directly or constructively owned 100% of B.E.G.M. and Progressive.

CONCLUSION

As this dispute presents only legal issues, it is ripe for summary judgment. Defendants' motion will be denied and plaintiffs' will be granted. An order accompanies this opinion.

ORDER

AND NOW, this 28 day of August, 1986, upon consideration of plaintiffs' Motion for Summary Judgment, it is hereby ORDERED, ADJUDGED AND DECREED that:

1. Plaintiffs' Motion for Summary Judgment is GRANTED, and that judgment is hereby entered in favor of plaintiffs Amalgamated Meat Cutters and Butcher Workmen of North America Joint Council of Philadelphia and Vicinity Retail Meat Pension Fund and its Trustees and in favor of plaintiffs United Food and Commercial Workers Union and Participating Employers Tri-State Pension Fund, and against defendants Progressive Supermarkets, Inc., B.E.G.M. Associates, William Margulis, Edward S. Gold, the William Margulis Trust, and William Margulis and Marvin Schneiderman, as the Trustees of the William Margulis Trust.

2. Defendants Progressive and B.E. G.M. are a "single employer" under ERISA, 29 U.S.C. §§ 1002(37)(B) and 1301(b)(1), and that defendants Progressive and B.E.G.M. are "a group of trades or

businesses under common control" as determined under Section 414(c) of the Internal Revenue Code, 26 U.S.C. § 414(c).

3. Defendants William Margulis, Edward S. Gold, William Margulis as Trustee of the William Margulis Trust, and Marvin Schneiderman as Trustee of the William Margulis Trust, as partners of B.E.G.M., are liable with respect to the obligations of B.E.G.M., a general partnership.

4. Defendants will pay the sum of the quarterly withdrawal liability payments which are determined to be due and owing, and which Defendants have failed to pay. Plaintiffs shall file and serve a certified statement of the amount of withdrawal liability installments due and owing within twenty (20) days of the entry of this Order.

5. Defendants will pay prejudgment interest on the amount of withdrawal liability payments due and owing from the date on which the payment was due to the date of this Order, calculated in compliance with the regulations set forth at 29 CFR § 2644.1, *et seq.* Plaintiffs shall file and serve within twenty (20) days of the entry of this Order a certified statement of the amount of prejudgment interest to be paid.

6. Defendants will pay liquidated damages on the amount of withdrawal liability payments due and owing computed in accordance with Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2). Plaintiffs shall file and serve within twenty (20) days of the entry of this Order a certified statement of the amount of liquidated damages to be paid.

7. Defendants will pay attorneys' fees and costs in accordance with Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2). Plaintiffs shall file and serve a certified statement of such expenses within twenty (20) days of the entry of this Order. Defendants' objections, if any, to plaintiffs' statement of attorneys' fees and costs shall be filed and served within ten (10) days thereafter. If the parties are unable to resolve any disputes concerning plaintiffs' statement of attorneys' fees and costs, the matter will be referred to a Magistrate for resolution.

8. Defendants are hereby permanently ENJOINED from further violations of ERISA and the Pension Plan in connection with defendants' obligation to pay future withdrawal liability installments.