Joseph P. CONNORS, Sr.,
et al., Plaintiffs,

v.

INCOAL INC. a/k/a Incoal Coal
Co., et al., Defendants.

Civ. A. No. 86–3162.

United States District Court,
District of Columbia.

Jan. 15, 1992.

E. Calvin Golumbic, R. Steven Holt, Erin M. Sweeney, Arent Fox Kintner Plotkin & Kahn, Washington, D.C., for plaintiffs.

John R. Woodrum, C. Gregory Ruffennach, Smith, Heenan & Althen, Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

Before the Court are cross motions for summary judgment. Because there is no genuine issue of material fact and some of the moving parties are entitled to judgment as a matter of law, summary judgment is appropriate. For the reasons that follow, plaintiffs' motion is granted in part and denied in part, defendant Kite Coal Sales, Inc.'s motion is denied, and defendant Double A Farms' motion is granted.

### Background

This is an action to collect withdrawal liability under the Employment Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1001, *et seq.* Plaintiffs seek withdrawal liability in the principal amount of $840,929.05, plus interest, liquidated damages, attorneys' fees, and costs against the defendants jointly and severally.

Plaintiffs are the Trustees of the United Mine Workers of America 1950 Pension Plan ("1950 Plan") and the United Mine Workers of America 1974 Pension Plan ("1974 Plan") (collectively, the "Plans"), which are multiemployer pension plans under §§ 3(37) and 4001(a)(3) of ERISA, 29 U.S.C. §§ 1002(37), 1301(a)(3).

Defendant Incoal Inc., a/k/a Incoal Coal Company ("Incoal"), is a Kentucky corporation that was engaged in the business of acquiring, producing, processing, and/or cleaning coal and maintaining mine sites. Incoal was owned 25% each by Orville Adkins, his wife Dixie, their son Adam, and Adam's wife Sally. Incoal was a signatory to the National Bituminous Coal Wage Agreements of 1978 and 1981 (collectively, the "Agreements"). Pursuant to the Agreements, Incoal participated in the Plans and was obligated to and made contributions to the plans on behalf of its employees covered by the Agreements.

Approximately seven years ago,[1] Incoal ceased to operate and ceased making contributions to the Plans. Pursuant to § 4202(2) of ERISA, 29 U.S.C. § 1382(2), by letters dated July 5, 1985, the 1950 Plan assessed Incoal $562,006.75 in withdrawal liability, and the 1974 Plan assessed Incoal $248,603.66.[2] Affidavit of Diane Duffin, Exhibit ("Duffin Ex.") A; Duffin Ex. B. The letters advised Incoal of the amount of its liability, established a schedule of payments, and offered, in the alternative, the option of paying its withdrawal liability in a lump sum. The letters also explained, in detail, Incoal's right to request review of its withdrawal liability under § 4219(b)(2)(A) of ERISA, 29 U.S.C. § 1399(b)(2)(A), and to initiate arbitration under § 4221 of ERISA, 29 U.S.C. § 1401. The letters highlighted the fact that Incoal's right to arbitrate any determination

---

1. Plaintiffs assert that Incoal ceased to operate in September 1984, but defendants allege that this did not occur until February 1985. The difference between the two dates, however, does not affect the amount of withdrawal liability assessed against Incoal, so it is not a material fact in dispute.

2. The Plans now assert that the amounts are $590,205.93 and $250,723.12 respectively. *See*

Affidavit of Diane Duffin at ¶ 11. Because plaintiffs assert that defendants are in default under § 4219(c)(5) of ERISA, 29 U.S.C. § 1399(c)(5), for failing to make withdrawal liability payments or dispute the amount of liability, it would be inequitable to now hold defendants liable for a higher sum of which they were never given notice prior to default. Thus, we will not consider these new computations.

by the Plans concerning liability would be lost unless timely action was taken by Incoal.

By letter dated July 16, 1985, Incoal informed the Plans that it had depleted its assets and was financially unable to pay the withdrawal liability. Duffin Ex. C. Thereafter, Incoal failed to make any withdrawal liability payments to the 1950 or 1974 Plans. Additionally, it did not request review of any matter relating to the Plans' determination of withdrawal liability, nor did it demand arbitration.

Consequently, by letter dated January 14, 1986, the Plans declared Incoal in default within the meaning of § 4219(c)(5) of ERISA, 29 U.S.C. § 1399(c)(5), and demanded immediate payment of the entire withdrawal liability plus interest. Duffin Ex. D. Furthermore, this letter advised Incoal that the demand was being made against Incoal, any trade or business under common control with it, and any person receiving assets from it in a transaction to evade or avoid withdrawal liability. Again, no payments were made.

Accordingly, on November 17, 1986, the Plans filed suit against Incoal and S & H Manufacturing, Inc. ("S & H"), as a trade or business under common control, to collect the withdrawal liability, liquidated damages, accrued interest, attorney's fees and costs, and for declaratory relief.

S & H is a Kentucky corporation engaged in the business of manufacturing, repairing, and selling mining equipment. At all times relevant to this suit, defendants Orville Adkins, Dixie Adkins, Adam Adkins, and Sally Adkins each owned 25% of the outstanding stock of S & H.

Through the discovery process, plaintiffs learned of the existence of additional entities which they alleged were controlled group members. On July 9, 1987, plaintiffs filed an amended complaint naming Kite Coal Sales, Inc. ("Kite Coal"), Double A Farms, and Adkins Coal Co. ("Adkins Coal") as additional defendants. On September 6, 1989, plaintiffs filed a second

amended complaint naming Sly Branch Coal Co. ("Sly Branch") as an additional defendant. Both Adkins Coal and Sly Branch, however, have been previously dismissed from this case, Adkins Coal having been dismissed pursuant to Fed.R.Civ.P. 12(b) on October 27, 1988, *Connors v. Incoal Inc.*, 699 F.Supp. 3 (D.D.C.1988), aff'd, 907 F.2d 1227 (D.C.Cir.1990),[3] and Sly Branch having been dismissed pursuant to a stipulated dismissal on September 13, 1991.

Double A Farms is a partnership which acquired real estate in and around Harrison County, Kentucky and used such land for recreation and investment purposes, and also to grow tobacco and raise cattle. Defendants Orville, Dixie, Adam, and Sally Adkins—who also owned Incoal—each owned a 25% partnership interest in Double A Farms.

Kite Coal is a Kentucky corporation which engaged in the business of selling coal. At all times relevant to this suit, defendants Orville and Adam Adkins were the sole shareholders of Kite Coal, each owning 50% of its outstanding voting stock.

Neither Double A Farms nor Kite Coal were parties to the Agreements, nor were they participating employers in the Plans.

Incoal and S & H have not opposed plaintiffs' motion for summary judgment, thereby conceding liability. Judgment will therefore be entered in plaintiffs' favor as to these defendants. Only two defendants, Double A Farms and Kite Coal, remain. The issue, thus, is whether either one or both of them is a trade or business under common control with Incoal under § 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1), and therefore is to be treated as a single employer for purposes of assessing and collecting withdrawal liability.

*The Statutory Scheme*

■ The statutory language at issue here, § 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1), provides that, for purposes of

---

**3.** Adkins Coal was dismissed because it was dissolved before Incoal incurred the liability at issue. 699 F.Supp. at 4–5.

the withdrawal liability provisions in Title IV:

> [U]nder regulations prescribed by the [Pension Benefit Guaranty C]orporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer. The regulations prescribed under the preceding sentence shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of the Internal Revenue Code of 1954.

Thus, when an employer participating in a multiemployer pension plan incurs withdrawal liability, all trades or businesses under common control with that employer are deemed responsible jointly and severally for paying the withdrawal liability.

■■■ Interpretation of this provision should take place within the larger context of the purposes behind ERISA and MPPAA. ERISA was established to ensure that employees promised certain benefits upon retirement would, in fact, receive those benefits. The original legislation, however, neglected to include liability provisions for a single employer's withdrawal from a multiemployer pension plan. MPPAA was intended, in part, to discourage employers from withdrawing from such plans and leaving them with inadequately funded liabilities. H.R.Rep. No. 869, 96th Cong., 2d Sess. 67, *reprinted in* 1980 U.S.Code Cong. & Ad.News, 2918, 2935; *see also United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & Mc Donnell, Inc.*, 787 F.2d 128, 130–31 (3d Cir.1986), *aff'd*, 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987). It does so by imposing

upon the withdrawing employer a mandatory liability, defined in the statute as the employer's adjusted "allocable amount of unfunded vested benefits." 29 U.S.C. § 1381(b)(1).

Congress enacted the "common control" provision of § 1301(b) in order "to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities." *Teamsters Pension Trust Fund v. H.F. Johnson, Inc.*, 830 F.2d 1009 (9th Cir.1987). As the report of the Senate Finance Committee stated:

> the committee ... intends to make it clear that the coverage and antidiscrimination provisions cannot be avoided by operating through separate corporations instead of separate branches of one corporation.

S.Rep. No. 383, 93d Cong.2d Sess. 43, *reprinted in*, 1974 U.S.Code Cong. & Ad. News 4639, 4928.

### *Defendants' Liability Under the Statute*

■■■ Once liability of the principal employer is established (here, it is conceded), only two elements need be established to spread that liability to other entities: that they are (1) trades or businesses which are (2) under common control. Defendants Double A Farms and Kite Coal do not argue that they are not under common control with Incoal.[4] Thus, the only issue as far as the statute is concerned is whether these two entities are trades or businesses. If they are, under the inexorable operation of § 1301(b)(1), they become jointly and severally liable for Incoal's entire withdrawal liability.

---

**4.** The Pension Benefit Guaranty Corporation prescribed regulations, codified at 29 C.F.R. § 2612, which incorporate by reference regulations promulgated by the Secretary of Treasury under the Internal Revenue Code which define whether two trades or businesses are under common control. 26 C.F.R. § 1.414(c). Two or more businesses owned by the same small group of persons are defined as a "brother-sister" controlled group. 26 C.F.R. § 1.414(c)–2(c).

As stated above, Orville Adkins, his wife Dixie Adkins, their son Adam Adkins, and his wife

Sally Adkins each owned 25% of the voting stock of Incoal. The exact same individuals each owned a 25% partnership interest in Double A Farms, thereby making it under common control with Incoal. Only Orville and Adam Adkins owned outstanding voting stock (50% each) of Kite Coal, but under the constructive ownership rules, 26 C.F.R. § 1.414(c)–4(b), an individual's ownership interest in an entity is attributable to his or her spouse. Thus, Kite Coal is also under common control with Incoal.

ERISA contains no statutory definition of the term "trade or business." Under ERISA, "trade or business" has the same meaning that it does under § 414(c) of the Internal Revenue Code and the regulations thereunder. 29 C.F.R. § 2612.2; *see also United Food and Commercial Workers Union v. Progressive Supermarkets*, 644 F.Supp. 633, 637 (D.N.J.1986). Even so, "the precise meaning or connotation of the term appears to vary depending upon the provision in which it is used." *Groetzinger v. Commissioner of Internal Revenue*, 771 F.2d 269, 271 (7th Cir.1985), *aff'd*, 480 U.S. 23, 107 S.Ct. 980, 94 L.Ed.2d 25 (1987). Thus, courts have adopted a case-by-case approach to determine whether an entity constitutes a trade or business under ERISA. *Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. Lafrenz*, 837 F.2d 892, 894 n. 6 (9th Cir.1988) (determining whether an entity is a trade or business is "an essentially factual inquiry") (citations omitted).

### Kite Coal

■ We will begin with the easier question: Is Kite Coal a trade or business? Interestingly, defendants never assert that Kite Coal is not a trade or business. Instead, they argue that plaintiffs have not proven that Kite Coal operated as a trade or business. Defendants' Opposition to Plaintiffs' Motion for Summary Judgment ("Defendants' Opposition") at 23–24. The record, however, reflects sufficient evidence for us to conclude that Kite Coal operated as a trade or business. In 1983 and 1984, Kite Coal filed corporate tax returns indicating that it was in the business of wholesale coal sales. Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment and in Further Support of Plaintiffs' Motion for Partial Summary Judgment, Exhibits ("Plaintiffs' Opposition Ex.") 13, 14. In addition, two individuals associated with Kite Coal made statements in depositions indicating that Kite Coal was a trade or business.[5] Because Kite Coal operated as a trade or

business under common control with Incoal, it is liable jointly and severally for Incoal's withdrawal liability.

### Double A Farms

■ Whether the remaining defendant, Double A Farms, is a trade or business is a closer question. Defendants argue that Double A Farms was not a trade or business, but an "investment" and "recreational property." Defendants' Opposition at 16. Double A Farms was a partnership which owned land in Harrison County, Kentucky (which defendants assert is 150 miles from where Incoal was located). Two economic activities occurred on this land: the growing of tobacco and the raising of cattle. It had no connection with the coal business. Defendants point out that it was bought primarily as an investment and a place to go squirrel and bird hunting. Defendants' Opposition at 11–12. They state that the only reason tobacco was grown on that land was because the property had a tobacco allotment when it was purchased which would have been lost (and the value of the property thus diminished) if not utilized. Affidavit of Willis Newsome at ¶ 3. The few head of cattle, they claim, were on the land merely "for the owners' personal enjoyment and to keep the grass mowed." Defendants' Reply to Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Defendants' Reply") at 9.

The issue before the Court is whether this limited economic activity rises to the level of a trade or business as that term is used in § 1301. The vast majority of cases finding that a separate entity which merely engages in limited economic activity is a trade or business under § 1301 have involved entities with some economic nexus with the principal. *See, e.g., Trustees of the Amalgamated Insurance Fund v. Saltz*, 760 F.Supp. 55, 57–58 (S.D.N.Y. 1991); *Central States, Southeast and Southwest Areas Pension Fund v. Lloyd*

---

**5.** Orville Adkins, one of Kite Coal's owners stated that "I believe Kite did sell a little coal there one year. It was a sales company set up." Deposition of Orville Adkins at 82. In addition,

Willis Newsome, Kite Coal's accountant, stated that coal had been sold through that corporation. Deposition of Willis Newsome at 52.

*L. Sztanyo Trust,* 693 F.Supp. 531, 537–38 (E.D.Mich.1988); *Central States, Southeast and Southwest Areas Pension Fund v. Skyland Leasing Co.,* 691 F.Supp. 6, 11–12 (W.D.Mich.1987), *aff'd,* 892 F.2d 1043 (6th Cir.1990); *Progressive Supermarkets,* 644 F.Supp. at 637–39; *Pension Benefit Guaranty Corporation v. Center City Motors, Inc.,* 609 F.Supp. 409, 411–12 (S.D.Cal. 1984); *see also Textile Workers Pension Fund v. Oltremare,* 764 F.Supp. 287, 289 (S.D.N.Y.1989) ("when ownership of real property has been considered a trade or business within a control group, there has been a solid nexus between the real property and the other trades or businesses within the control group"). The outcome in this line of cases promotes ERISA's goal of preventing fractionalizing which would thwart the ability of pension funds to collect withdrawal liability.

■ However, there is a split among the cases which have addressed the issue of whether § 1301 requires that commonly controlled entities be economically related in order to be jointly and severally liable for the withdrawal liability of the principal. Several have held that no such nexus is required. *Lafrenz,* 837 F.2d at 895; *O'Connor v. DeBolt Transfer, Inc.,* 737 F.Supp. 1430, 1443–44 (W.D.Pa.1990); *Local 478 Trucking and Allied Industries Pension Fund v. Jayne,* 778 F.Supp. 1289, 1305–06 (D.N.J.1991). A careful reading of these cases, however, will reveal that the courts' holding on this point was usually supported by no analysis of the key issue (*i.e.* whether in light of the unique facts of that case, classifying the entity as a trade or business would promote the purposes of ERISA) and was, in at least one of these cases, little more than dictum.

In two cases (both decided within the last year), however, courts have not ducked the issue of whether a nexus exists between the principal and the entity under common control in determining whether it qualifies as a trade or business under § 1301.[6] In *Central States, Southeast and Southwest Areas Pension Fund v. Personnel, Inc.,* No. 90–C–1051, 14 Employee Benefits Cas. (BNA) 1082, 1991 WL 104184 (N.D.Ill. June 12, 1991), a sole proprietorship engaged in the real estate business was under common control with the principal corporation (which leased truck drivers to other firms). Recognizing that whether or not the sole proprietorship rose to the level of a trade or business was dispositive of the case, the court sought to analyze the alleged real estate business in light of the purposes underlying ERISA. *Id.* at *4. Ultimately, the court found that the sole proprietorship did not constitute a trade or business because, *inter alia,* "the alleged business had nothing whatsoever to do with the withdrawn corporation" at the time of withdrawal.[7] *Id.* at *6.

The facts of the instant case are substantially more supportive of a finding that the non-principal entity is not a trade or business, because here, there is no evidence that Double A Farms *ever* had any economic connection with Incoal. In contrast, the sole proprietorship in *Central States* leased a building to the principal corporation for five years, up until just over a year before withdrawal occurred. *Id.* at *7. Thus, there is even less reason for finding that Double A Farms constitutes a trade or business because there is even less of a nexus between the entities in question.

In the other recent case, *ILGWU National Retirement Fund v. Minotola Industries, Inc.,* No. 88–9131, 1991 WL 79466, 1991 U.S.Dist. LEXIS 6147 (S.D.N.Y. May 3, 1991), plaintiff pension fund sued the withdrawn corporation and an entity under common control, an unincorporated farm owned by the owner of the

---

**6.** At least one other court has also recognized that whether or not there is a connection between the withdrawn corporation and the entity allegedly under common control is a factor to be considered in determining whether that entity qualifies as a trade or business under § 1301. *Textile Workers Pension Fund v. Oltremare,* 764 F.Supp. 287, 289 (S.D.N.Y.1989).

**7.** Other facts which the court found to be probative were that there was no co-mingling of funds between the two entities, nor was there evidence that any of the real estate investments were an attempt to shirk ERISA obligations. *Central States* at *7.

withdrawn corporation. The court reasoned that it was necessary to look to the purpose behind the control group rule of MPPAA to determine whether the farm constituted a trade or business under these facts. *Id.,* 1991 W.L 79466 at *3–4, 1991 U.S.Dist. LEXIS 6147 at *11–12. In this regard, the court held that

> whether a nexus or economic relationship exists between the withdrawing entity and another entity under common control is relevant to, although not dispositive of, the question whether the latter entity is a "trade or business" within the meaning of section 1301(b)(1). Under this reasoning, an operation which clearly constitutes a "trade or business" (e.g., an operating corporation with a management structure manufacturing and selling a product) would not have to have any economic relationship with the withdrawing entity. *However, in a situation occupying a more shadowy area between "trade or business" and mere investment or hobby, an economic nexus with the withdrawing company would be relevant to a court's determination whether that operation constituted a "trade or business" under ERISA.*

*Id.,* 1991 WL 79466 at *5, 1991 U.S.Dist. LEXIS 6147 at *14 (emphasis added). The court ultimately concluded that the farm was a trade or business because it was a commercial leasing operation, a type of activity outside of the "shadowy area." *Id.,* 1991 WL 79466 at *5–6, 1991 U.S.Dist. LEXIS 6147 at *15–18.

In the case *sub judice,* however, the farm is not a commercial leasing operation. This Court is satisfied that the small amount of tobacco farming at the Double A Farms was incident to maintaining the value of the property *as an investment,* not for the purpose of engaging in the trade or business of tobacco farming. In addition,

the level of cattle grazing which occurred at the Double A Farms property was minimal and not sufficient to raise the operation to a "trade or business."

This case thus falls squarely within the "shadowy area" envisioned by the court in *Minotola, i.e.* the area between a trade or business on the one hand and a "mere investment or hobby" on the other. Consideration and inquiry into any economic nexus between Double A Farms and Incoal becomes relevant and appropriate. As noted above, there is no such nexus, tenuous or direct. No products were bought or sold between the entities, nor were there any leases or contracts between them. The entities did not even share geographic proximity, being approximately 150 miles from one another.

In light of the foregoing, it would be inappropriate and not in keeping with the purposes underlying ERISA and MPPAA to hold that Double A Farms constitutes a trade or business.[8] We, therefore, hold that Double A Farms is not a trade or business as that term is used in § 1301, and that it is not liable for any of Incoal's withdrawal liability.[9]

### Conclusion

Because defendant Incoal is in default due to its failure to make withdrawal liability payments, and because defendants S & H and Kite Coal were trades or businesses under common control with Incoal, under § 502(g) of ERISA, 29 U.S.C. § 1132, they are jointly and severally liable to the 1950 Plan for $562,006.75 plus interest and statutory damages equal to interest, and to the 1974 plan for $248,603.66 plus interest and statutory damages equal to interest. In addition, plaintiffs are entitled to reasonable attorney's fees and costs from these

---

**8.** Double A Farms' selection to deduct depreciation for its property in Part I of Internal Revenue Service Form 4562 as opposed to Part III (where the form specifies that recreational property should be deducted), *see* Plaintiffs' Opposition Exs. 3–5, does not prove that it was a trade or business for purposes of § 1301. The terminology of the Internal Revenue Code is not determinative of whether an entity is a trade or business under ERISA. Instead, as stated

above, whether an entity is a trade or business as that term is used in § 1301 should be determined with reference to the purposes of ERISA and MPPAA, not the tax code.

**9.** In light of this disposition, it is not necessary to reach Double A Farms' constitutional arguments.

defendants. Because Double A Farms is not a trade or business under common control with Incoal, it is not liable for any of Incoal's withdrawal liability.